STATE *vs.* ANTHONY OLYNIK.

MARCH 30, 1955.

PRESENT: Flynn, C. J., Capotosto, Baker, Condon and O'Connell, JJ.

32

CAPOTOSTO, J. This is a criminal complaint, under general laws 1938, chapter 612, §36, charging that the defendant knowingly had in his possession certain slips used in carrying on, promoting, and playing the game commonly known as policy-lottery or policy. In the superior court the defendant, who waived jury trial, was tried and found guilty by a justice of that court. The case is before us on the defendant's exception to the denial of his motion, before trial, to suppress evidence in the form of lottery slips allegedly obtained in an illegal search and seizure, and on his further exception to the admission of such evidence at the trial. Both exceptions raise the same question, namely, whether such evidence is admissible against a defendant in a criminal prosecution in the courts of this state in view of article I, sec. 6, of the Rhode Island constitution. We note here that while the case was pending in this court the defendant, by stipulation in writing and of record, waived any rights he may have had under the United States constitution.

The undisputed facts may be outlined as follows. The defendant and his mother occupied a tenement of a house in the city of Providence. In his absence the mother, who was unfamiliar with the English language, admitted certain police officers into her home believing that they wanted to

use the telephone. Apparently this was not their purpose, as they immediately began to search the premises without her consent. While such search was in progress defendant came home and protested against the officers' conduct in general and particularly against their seizing the lottery slips in question, which they found in his bedroom.

The ultimate issue here is whether, in a criminal prosecution by the state, evidence procured by police officers in an illegal search and seizure should be rejected, although otherwise competent, because obtained in violation of article I, sec. 6, of the Rhode Island constitution. It is now beyond discussion that there is a marked division of authority on this important question which in comparatively recent years has been the subject of serious consideration, with conflicting results, by both the United States and state courts. As was well said by Cardozo, J. in *People* v. *Defore,* 242 N. Y. 13, at page 24: "The question is whether protection for the individual would not be gained at a disproportionate loss of protection for society. On the one side is the social need that crime shall be repressed. On the other, the social need that law shall not be flouted by the insolence of office. There are dangers in any choice."

The question here has been considered on numerous occasions by the supreme court of the United States in connection with article IV of the amendments to the federal constitution. That amendment is substantially the same as article I, sec. 6, of the Rhode Island constitution, which is the *only* section or provision in our constitution that defendant has invoked and briefed or argued in this case. It reads as follows: "The right of the people to be secure in their persons, papers and possessions, against unreasonable searches and seizures, shall not be violated; and no warrant shall issue, but on complaint in writing, upon probable cause, supported by oath or affirmation, and describing as nearly as may be, the place to be searched, and the persons or things to be seized."

The development of the conflict among the authorities in this country with reference to the admission or rejection of evidence obtained by a police officer in an illegal search and seizure deserves attention. At common law relevant evidence was not excluded because of such wrongful conduct. 20 Am. Jur., Evidence, §394; 8 Wigmore on Evidence (3d ed.), §2183, notes 1 and 2, pp. 5 and 11. Under that rule the injured party has a direct remedy against the wrongdoer. An illegal search and seizure is a trespass for which a person, especially if he be charged with the duty of enforcing the law, should and probably would be severely punished by a jury through the award of heavy damages, as was done in the early cases of *Entick* v. *Carrington* (1765), 19 Howell's State Trials 1029, and *Wilkes Case,* Id., at 981 and Addenda at 1382. See also *Johnson* v. *Comstock,* 14 Hun. (N. Y.) 238. So far as we are informed, this is the settled law of England and its dependencies up to the present time.

The English rule was followed and applied in this country until 1886 when *Boyd* v. *United States,* 116 U. S. 616, was decided. That was a federal prosecution for violation of the revenue laws. The court there held among other things that the admission of evidence obtained by an illegal search and seizure violated the fourth amendment to the United States constitution. In 1904 the same question was considered by the United States supreme court in *Adams* v. *New York,* 192 U. S. 585, where illegally obtained evidence had been admitted against a defendant on trial for a crime in a state court. The decision in that case did not apply the rule of the *Boyd* case but expressly approved precedents in the state courts that were contrary thereto.

The situation thus created apparently remained unchanged until 1914 when the question as to the admissibility of evidence procured in an illegal search again came before the supreme court for adjudication in *Weeks* v. *United States,* 232 U. S. 383. In that case the defendant was convicted of sending lottery tickets through the mail in viola-

tion of a federal statute. Certain letters connecting him with the lottery, which were seized in an unlawful search of his home, were admitted in evidence over objection. In that opinion, written by the same justice who wrote the one in *Adams* v. *New York, supra,* the court reverted to the reasoning in *Boyd* v. *United States, supra,* and reversed the conviction. But in so doing it qualified the rule of exclusion as set forth in the *Boyd* case by holding that, in order to render inadmissible under the fourth amendment the evidence so obtained by federal officers, the defendant should move to suppress it before trial, otherwise it would be admissible notwithstanding that it had been unlawfully obtained. Numerous later decisions applying such rule of exclusion with further modifications need not be discussed here, as it is now well settled that evidence illegally seized by *federal officers* is not admissible in federal prosecutions. See *Agnello* v. *United States,* 269 U. S. 20; *United States* v. *Lefkowitz,* 285 U. S. 452; *Goldman* v. *United States,* 316 U. S. 129; *Harris* v. *United States,* 331 U. S. 145; *Trupiano* v. *United States,* 334 U. S. 699; *Brinegar* v. *United States,* 338 U. S. 160; *United States* v. *Rabinowitz,* 339 U. S. 56; *United States* v. *Jeffers,* 342 U. S. 48; *On Lee* v. *United States,* 343 U. S. 747.

A different situation prevailed in prosecutions for crime by the state. Following the common-law rule, which was in effect approved by the United States supreme court in *Adams* v. *New York, supra,* a decided majority of the states continued to hold that, notwithstanding the decision in *Weeks* v. *United States, supra,* relevant evidence obtained by an illegal search and seizure was admissible against a defendant in a criminal prosecution by the state.

The state rule was again challenged recently in *Wolf* v. *Colorado,* 338 U. S. 25, where the defendant, who was convicted of crime in a state court, claimed that the admission of illegally obtained evidence violated his rights under the fourteenth amendment to the federal constitution. The court rejected the contention holding that; while it adhered

to the rule of *Weeks* v. *United States, supra,* in federal prosecutions, such rule was not imposed on the states by the fourteenth amendment. Referring to its decision in the *Weeks* case the court, at page 28, stated that the ruling there made "was not derived from the explicit requirements of the Fourth Amendment * * * The decision was a matter of *judicial implication";* and further that as a matter of inherent reason the admission or exclusion of evidence illegally obtained was one "as to which men with complete devotion to the protection of the right of privacy might give different answers." (italics ours)

The decision in the *Wolf* case in substance held that in prosecutions by the United States government the exclusion of illegally obtained evidence was a rule of evidence for the federal courts; that, considering the "weighty testimony" furnished by the opinion in *People* v. *Defore,* 242 N. Y. 13, against such rule, the court would not insist that its view in the matter be adopted in prosecutions by the state; and that "There are, moreover, reasons for excluding evidence unreasonably obtained by the federal police which are less compelling in the case of police under State or local authority. The public opinion of a community can far more effectively be exerted against oppressive conduct on the part of police directly responsible to the community itself than can local opinion, sporadically aroused, be brought to bear upon remote authority pervasively exerted throughout the country."

A classification of the decisions by state courts approving or rejecting the rule of *Weeks* v. *United States, supra,* is to be found in an appendix to the *Wolf* case, *supra,* reference to which is hereby made. According to such summary sixteen states approved while thirty-one states rejected the rule of the *Weeks* case. Included in those rejecting such rule are Maine (*State* v. *Schoppe,* 113 Me. 10), New Hampshire (*State* v. *Agalos,* 79 N. H. 241), Vermont (*State* v. *Stacy,* 104 Vt. 379), Massachusetts (*Commonwealth* v. *Wilkins,* 243 Mass. 356), Connecticut (*State* v. *Reynolds,* 101 Conn.

224), and New York (*People* v. *Richter's Jewelers, Inc.*, 291 N. Y. 161).

Commenting on the effectiveness of the federal rule in the very recent case of *Irvine* v. *California*, 347 U. S. 128, where a conviction by the state involving the admission of illegally obtained evidence was sustained, the court, at pages 135 *et seq.*, stated: "Our case's evidence the fact that the federal rule of exclusion and our reversal of conviction for its violation are not sanctions which put an end to illegal search and seizure by federal officers * * * The extent to which the practice was curtailed, if at all, is doubtful * * * There is no reliable evidence known to us that inhabitants of those states which exclude the evidence suffer less from lawless searches and seizures than those of states that admit it. Even this Court has not seen fit to exclude illegally seized evidence in federal cases unless a federal officer perpetrated the wrong."

Keeping in mind our review of the authorities which we have herein but sketchily summarized, we now come to the consideration of the single question raised and argued by the defendant in the instant case, namely, whether in a trial for crime in the courts of this state section 6 of article I of the Rhode Island constitution prohibits the admission of evidence obtained in an illegal search and seizure. By its language that section, which is essentially the same as article IV of the amendments to the United States constitution, is declaratory of a fundamental principle that should be jealously protected. But section 6 does not purport to be self-enforcing, nor does it contain any prohibition, either in express language or by necessary implication, against the admission in a prosecution by the state of illegally obtained evidence. If the provisions of that section were intended to be self-enforcing or to demand such a prohibition, that intention could and undoubtedly would have been expressed in unequivocal terms, since it would have constituted a radical change from the then unquestioned and established practice. There is no such language. Moreover, when they

intended to prohibit the use of particular evidence in a criminal trial, they did so in express language. See article 1, sec. 13, of the Rhode Island constitution.

The intention of the framers of section 6 should be ascertained from the language used by them in the light of historical facts well known to those who were interested when our constitution was adopted in 1842. Up to that time the admission or exclusion of evidence, such as here in question, was governed by the common law. Since the truth was the objective, it was then the settled practice in both federal and state courts to admit relevant and material evidence in a criminal prosecution regardless of the unlawful method by which it was obtained. Under such practice the misconduct of a police officer was not condoned but was punishable in a substantial manner to the advantage of an aggrieved person, as in *Entick* v. *Carrington, supra.*

Furthermore, for over fifty years before the adoption of our constitution Rhode Island lived under and observed the effects of the fourth amendment to the federal constitution, which, as hereinbefore stated, is substantially the same as section 6 of article I of our constitution. During all that period there was no decision by the United States supreme court holding that the fourth amendment by its terms was self-enforcing; or that it contained or was intended to contain a prohibition against the use of evidence obtained by an unlawful search; or that it purported to change in any way the settled practice with reference to the admissibility of evidence in the trial of persons accused of crime. Furthermore throughout that period of more than fifty years our legislature, having before it the position of the United States supreme court respecting the fourth amendment, likewise made no change in the procedure relating to the admissibility of evidence in prosecutions for violations of the criminal laws of this state.

In our view the fourth amendment to the federal constitution does not derive its origin in a direct protest by the people against a rule of evidence. At the time of the Revo-

lution the colonists were clamoring for protection against the unrestrained issuance of writs of assistance, so called, by the colonial government to revenue officers empowering them, in their discretion, to make a general search of suspected places for smuggled goods. The resentment entertained by the colonists respecting such writs was quite similar to that shown by the people in England to the increasingly objectionable practice by the government of issuing warrants empowering the enforcing officers to enter and search the home or place of any person suspected of political offenses or seditious libel for the purpose of seizing his private papers.

In our judgment the inhibition of the fourth amendment to the United States constitution was a constitutional restraint upon the powers of government, and not a prohibition in the use of relevant evidence illegally obtained. The utter silence of that amendment as to the procedure to be followed in enforcing its mandate is a clear indication that in that respect it was merely declaratory of the common law. We find no convincing reason requiring us to consider article I, sec. 6, of our constitution from a different viewpoint, especially since, as a matter of fact, the common-law rule admitting unlawfully obtained evidence was generally applied by the courts of this country until 1886 when it was questioned for the first time in *Boyd* v. *United States, supra.*

Historically, the background at the time of the adoption of the state constitution was in brief as follows. First, there was a long adherence by all courts to the common-law rule admitting material evidence even though obtained in an illegal search and seizure, notwithstanding the provisions of article IV of the amendments to the federal constitution; and secondly, neither the state legislature nor the court changed that rule in any way prior to 1842, when our constitution was adopted. This background was undoubtedly well known to those who were charged with the extremely delicate mission of drafting an instrument that was to change the government of this state from one under the

charter granted by King Charles II to one under a constitution.

We cannot believe that with such knowledge at hand the framers of an instrument which would so vitally affect the future welfare of our citizens intended to cast aside the experience of years and prohibit the use of evidence which the courts of England and this country had theretofore received without question. If the men who drafted our constitution contemplated such a result and intended to make inadmissible evidence which had been long established as admissible in criminal trials, it is our firm conviction that they would have expressed themselves in language so direct and unequivocal as to leave nothing for doubtful intendment or judicial implication.

The constitutional right of the individual against unlawful search and seizure should be scrupulously preserved, but at the same time the equally important right of the people to be protected from crime cannot be lightly cast aside. The exclusion of relevant evidence unlawfully obtained punishes society in favor of the individual. On the other hand, the admission of such evidence, although probably detrimental to an individual on trial for a criminal offense, enables the state to use the evidence in furtherance of its duty to protect the people's common right to live in peace and safety. However, in doing so it nevertheless subjects the officer who acted unlawfully to punishment by way of substantial damages to the aggrieved party, to disciplinary action at the hands of his superiors, and conceivably to prosecution criminally if the legislature so provided. Furthermore, if at any time it is deemed desirable or necessary in the public welfare to abolish or modify the common-law rule admitting evidence obtained by illegal search and seizure, it is within the power of the legislature, which has wide discretion in matters of policy and procedure, to effectuate such a change.

For the reasons herein stated it is our opinion that article I, sec. 6, of the Rhode Island constitution, which is the only

provision thereof relied on by the defendant in the instant case, does not prohibit, either in express language or by *necessary* implication, the admission of relevant and material evidence obtained in an illegal search and seizure. Under such a view we deem it our duty to refrain from incorporating by *judicial* implication into sec. 6 language that would abrogate a rule of evidence which has met with approval in this state both under the charter and the constitution.

The defendant's exceptions are overruled, and the case is remitted to the superior court for further proceedings.

CONDON, J., dissenting. I cannot agree with the majority that the problem here is one of choosing between two conflicting rules of evidence. I think a grave question of constitutional law is involved. That question may be stated as follows: Does the state constitution bind our courts to exclude evidence obtained by the state in violation of defendant's rights as declared in sec. 6 of article I thereof? In my opinion the answer must be in the affirmative because of the mandatory language of that article.

That language is as follows: "In order effectually to secure the religious and political freedom established by our venerated ancestors, and to preserve the same for our posterity, we do declare that the essential and unquestionable rights and principles hereinafter mentioned shall be established, maintained, and preserved, and *shall be of paramount obligation in all legislative, judicial, and executive proceedings.*" (italics supplied) One of these "essential and unquestionable rights" is the right of the people to be secure from unreasonable searches and seizures as guaranteed by sec. 6. That section reads almost word for word like its great counterpart, the fourth amendment to the federal constitution.

The right so meticulously protected by that constitutional guaranty has often been called the great right of privacy; the right of free men to be let alone. It has always been looked upon with high favor and most jealously

guarded by the federal supreme court. "Of all the rights of the citizen," said Mr. Justice Field, "few are of greater importance or more essential to his peace and happiness than the right of personal security, and that involves, not merely protection of his person from assault, but exemption of his private affairs, books, and papers from the inspection and scrutiny of others. Without the enjoyment of this right, all other rights would lose half their value." *In re Application of Pacific Ry. Comm'n, C. C.,* 32 Fed. 241, 250. That is indeed high praise but the supreme court deemed it so well merited that they quoted it with approval in *Interstate Commerce Comm'n v. Brimson,* 154 U. S. 447,479. That court has continued to entertain such view consistently down through the years. Only recently Mr. Justice Frankfurter speaking for the court in *Wolf v. Colorado,* 338 U. S. 25, 27, declared: "The security of one's privacy against arbitrary intrusion by the police—which is at the core of the Fourth Amendment—is basic to a free society."

Many years ago the court protected this right against an act of congress which purported to authorize the use of evidence obtained in violation of the fourth amendment. *Boyd v. United States,* 116 U. S. 616, 630. Relying on principles enunciated by Lord Camden in *Entick v. Carrington,* 19 Howell's State Trials 1029, which they said affected "the very essence of constitutional liberty and security," they denounced that act as an infringement of those principles. And they pointed out that such principles were incorporated in the fourth amendment and applied "to all invasions on the part of the government and its employes of the sanctity of a man's home and the privacies of life." Today the *Boyd* case is considered one of the great landmarks of constitutional law. Mr. Justice Brandeis characterized it in his dissent in *Olmstead v. United States,* 277 U. S. 438, 474, as "a case that will be remembered as long as civil liberty lives in the United States."

The most recent statement of the supreme court on the scope of the protection afforded by the fourth amendment

appears in *Walder* v. *United States,* 347 U. S. 62, 64. In the following forcible language they said: "The Government cannot violate the Fourth Amendment—in the only way in which the Government can do anything, namely through its agents—and use the fruits of such unlawful conduct to secure a conviction. * * * Nor can the Government make indirect use of such evidence for its case * * * or support a conviction on evidence obtained through leads from the unlawfully obtained evidence * * *. All these methods are outlawed, and convictions obtained by means of them are invalidated, because they encourage the kind of society that is obnoxious to free men."

The court has also taken a clear and forthright stand as to how this right of privacy may be most effectively enforced. In *Weeks* v. *United States,* 232 U. S. 383, they marked out the procedure to be followed to obtain the court's assistance in preventing the use of such unlawfully acquired evidence. In *Byars* v. *United States,* 273 U. S. 28, 32, they made it plain that the "court must be vigilant to scrutinize the attendant facts with an eye to detect and a hand to prevent violations of the Constitution by circuitous and indirect methods." And they did just that in upholding the contentions of the defendants in the recent cases of *McDonald* v. *United States,* 335 U. S. 451, *Lustig* v. *United States,* 338 U. S. 74, and *United States* v. *Jeffers,* 342 U. S. 48.

In the *McDonald* case, at page 453, the court said that the fourth amendment "marks the right of privacy as one of the unique values of our civilization and, with few exceptions, stays the hands of the police unless they have a search warrant issued by a magistrate on probable cause supported by oath or affirmation. And the law provides as a *sanction against the flouting of this constitutional safeguard the suppression of evidence* secured as a result of the violation, when it is tendered in a federal court." (italics supplied)

That statement is in line with what the court had previously said in *Silverthorne Lumber Co.* v. *United States,* 251 U. S. 385, namely, that if such sanction were not ac-

corded to the fourth amendment it would be reduced to "a form of words." Very recently the court reiterated that view in *United States* v. *Wallace & Tiernan Co.,* 336 U. S. 793, 799. In fact over the long lapse of time since the *Weeks* case the court has staunchly adhered to the rule so strongly enunciated therein. Thus Chief Justice Taft, speaking for the court in *Olmstead* v. *United States, supra,* at page 462, said: "The striking outcome of the *Weeks* case and those which followed it was the sweeping declaration that the Fourth Amendment, although not referring to or limiting the use of evidence in courts, really forbade its introduction if obtained by government officers through a violation of the Amendment." And he further stated that the court there held with great emphasis that the protection of the amendment would be much impaired unless evidence thus obtained was excluded.

Of course the fourth amendment to the United States constitution is not directly applicable to the states in the manner in which the court applied it to federal prosecutions in *Weeks* v. *United States, supra,* and therefore we are not bound to follow that case. However, I have discussed the hereinbefore-cited federal cases not because they are precedents binding upon us but solely to illustrate the supreme court's view of the need of an effective sanction for the enforcement of the fourth amendment if it were not to fail utterly of its high purpose. As was stated in the *Weeks* case at page 393, that amendment "might as well be stricken from the Constitution" if such sanction were withheld by admitting evidence obtained in violation of the amendment. One authority on the bill of rights has said that the court, by according that sanction to the amendment, saved it from becoming a dead letter. See 35 Harv. L. R. 673, "The Progress of the Law" by Chafee.

In my opinion this long and unbroken line of decisions of the supreme court of the United States furnishes us with a safe and sure guide, if one were needed, in construing and applying the identical guaranty in our state constitu-

tion against unreasonable searches and seizures. Like that court we, too, are called upon to decide here whether this precious constitutional right shall live as a strong bulwark against a prying police state or become a dead letter. Free men in our free society cherish the constitution which guarantees their God-given rights and they do not want their courts of justice to tolerate officers of the law who deliberately violate it.

The most distinguished police official in America recently acknowledged this fact. "Our people," he stated, "may tolerate many mistakes of both intent and performance, but, with unerring instinct, they know that when any person is intentionally deprived of his constitutional rights those responsible have committed no ordinary offense. A crime of this nature, if subtly encouraged by failure to condemn and punish, certainly leads down the road to totalitarianism." Statement by Director J. Edgar Hoover in F.B.I. Law Enforcement Bulletin, Sept. 1952, p. 1, as quoted by Frankfurter, J. in *Irvine* v. *California*, 347 U. S. 128, 149.

I think that the United States supreme court has solved the problem in the way that it should be solved, that is, by serving notice on law enforcement officers that lawless conduct violating the constitutional right of the people to be free from unreasonable searches and seizures will be of no avail in our courts whose judges are sworn to support the constitution. Many of the state courts have now adopted the federal rule, although the majority still adheres to the old rule of the common law. At the time *Wolf* v. *Colorado*, *supra*, was decided ten had elected to follow the *Weeks* case and had overruled or distinguished prior decisions to the contrary. Six which had not theretofore passed on the question thereafter decided to follow it. Iowa had formulated the doctrine prior to the *Weeks* case but subsequently rejected it. Altogether thirty-one states have rejected the doctrine and sixteen have accepted it. But in my opinion the significant thing is not the score, but that ten states rejected their former view to embrace the *Weeks* doctrine.

If I were to decide our case simply on a choice of these two rules I would choose the *Weeks* doctrine because, by sternly discountenancing unconstitutional evidence, it alone accords an effective sanction to a great constitutional right.

However, there is in the language of our declaration of rights in article I of the state constitution, hereinbefore quoted, a more compelling reason that binds us here in Rhode Island to exclude this evidence. In my opinion that language is a supreme command. We are thereby charged in the judicial proceedings over which we preside to make the enforcement of those rights our paramount obligation. And we are reminded that such rights are essential to freedom and so must be maintained and preserved as we received them from our ancestors so that they may be transmitted unimpaired to our posterity. Such language recalls the long and bitter struggle of the people for freedom and security against despotism. Those solemn words of adjuration vividly remind us of an unforgettable dark era when government wantonly trampled upon the rights of men. And they speak to us of the people's fears that such doleful times could come again. In words too plain to be mistaken they charge their servants in the legislative, judicial, and executive branches of the government to address themselves in their proceedings, above all other considerations, to the maintenance and preservation of these essential and unquestionable rights.

Unless words have lost their meaning the judges of this court and of every other court in this state are obliged to discountenance any act in violation of those rights. But if courts receive evidence knowing that it has been unconstitutionally obtained they do just the opposite and give judicial countenance to the government's violation of the constitution. It is no excuse to say such violation is not the act of the government but the act of an officer beyond the scope of his authority. The only way the government acts is through its agents. And surely if it uses the fruits of its agents' unconstitutional acts it should not be heard to say

that it did not authorize them. To such a plea the courts of this state, in keeping with the explicit command of the declaration of rights, are under a paramount obligation to turn a deaf ear.

Nor is either of the other two departments of the government less obligated. The executive department in its proceedings, one of which is enforcement of the criminal laws, is also bound thereunder to respect the constitutional rights of the accused. If it manifests a design to act otherwise this court restrains it. The legislative department may not enact legislation which contravenes those rights. If it does, we declare such legislation void. In these instances we compel compliance with such paramount obligation. In the case of the judicial department the judges must respect that obligation in their proceedings. And if they fail to do so it is our duty to correct them. If we do not, the citizen has no other recourse.

In *Wolf* v. *Colorado, supra,* the United States supreme court has ruled that the *Weeks* case is not applicable to the states, at least as far as the decisions of the state courts admitting evidence obtained in violation of the guaranty of the fourth amendment are concerned. However, they did state in the *Wolf* case at page 28: "* * * we have no hesitation in saying that were a State affirmatively to sanction such police incursion into privacy it would run counter to the guaranty of the Fourteenth Amendment." Why they thus differentiate between a decisional rule approving the use of unconstitutional evidence and a statute which would authorize the same practice I do not know, and, since no federal constitutional question is raised here, we need not inquire. Thus what this court decides here is final. And the choice we must make is either to condemn violations of sec. 6 or to condone them. I regret profoundly that the majority has chosen to condone.

In Rhode Island until today a man's home was his castle. Until today his right of privacy was unquestionable. That

day is over. Now the constitutional guaranty of that precious right is no more than sounding brass or a tinkling cymbal. Deprived of the only sanction that could give it life, it has lost its efficacy. This decision is in effect a massive breach in that bulwark of liberty. It reassures lawless enforcement officers that they may invade any man's home and rummage among his private papers and possessions; and that the evidence they thereby secure, stained though it may be by deliberate violation of his constitutional rights, will be received and considered by the courts of this state.

Thus are the lessons of history that impelled our forefathers to include sec. 6 in the constitution disregarded. They placed it there, as they thought, to forestall unlawful and unreasonable searches and seizures. They believed it would be an effective obstacle to a prying police force which they feared and hated. That was the vicious thing which the supreme court aptly described in *United States* v. *Di Re,* 332 U. S. 581, 595, as "a too permeating police surveillance" and which they said the founders of our federal constitution seemed to think "was a greater danger to a free people than the escape of some criminals from punishment."

In this decision today it seems to me that we treat that grave danger lightly. And in doing so we hear but do not heed the solemn adjuration of the framers of the constitution to see to it that in our judicial proceedings the maintenance and preservation of this essential and unquestionable right of privacy be made of paramount obligation. Believing as I do that, under the mandatory language of our declaration of rights, it is the constitutional duty of this court to fully safeguard and protect that right, and that this duty cannot be effectively and faithfully discharged except by excluding evidence secured in violation of it, I dissent.

O'CONNELL, J., concurs in the dissenting opinion of Mr. Justice Condon.

## On Motion for Reargument.

APRIL 12, 1955.

Per Curiam. After our decision in the above case the defendant asked and received permission to file a motion for reargument. In support thereof his counsel has stated certain reasons on which he bases his contention that justice requires a reargument of the case. We have carefully considered such motion and reasons and we are of the opinion that they raise no question which in the circumstances warrants reargument.

Motion denied.

*William E. Powers, Atty. Gen., Raymond J. Pettine, Ass't Atty. Gen.,* for State.

*Peter W. McKiernan, Charles A. Kiernan,* for defendant.