DECISION
The State of Rhode Island has charged the defendant, Peter H. Underwood, with attempting to obtain and obtaining controlled substances by altering, prescriptions. See G.L. 1956 §21-28-4.05 (1)(b). In response, the defendant has pled not guilty and requested that the Court suppress all of the confidential health-care information that his health-care providers released during the investigation leading to the charges against him because such releases, made without his prior consent, allegedly violated his statutory privacy rights under the Confidentiality of Health Care Communications and Information Act (Confidentiality Act), chapter 37.3 of title 5.
 The Investigation and the Parties' Positions
On March 30, 1998, defendant, identifying himself as an agent of the U.S. Drug Enforcement Agency (DEA), presented a prescription for a controlled substance to a pharmacist at a local pharmacy. He requested that the prescription be filled with brand-name medication rather than a generic and, because his health insurance carrier would not cover brand-name medication when a generic is available, that the prescription not be processed through his carrier. After preparing the prescription as requested, however, the pharmacist inadvertently did just that. And while the carriers rejection of the prescription might be expected, the reason is probably not. Apparently, the carrier rejected the prescription because its records indicated that a similar prescription had been recently filled and covered at another local pharmacy. After verifying this, the pharmacist told defendant that she would not fill the prescription until after she spoke with both physicians to ensure that each was aware of what the other was prescribing. In reply, defendant asked for the prescription back. The pharmacist, however, declined and defendant, acquiescing, left.
Within the next couple of days, the pharmacist contacted both prescribing physicians, each of whom professed to be unaware of the other's prescription. Moreover, one of them asked to be sent defendant's prescription profile[1] and that defendants prescription not be filled. The increasingly-concerned pharmacist then searched her pharmacy's central database to discover whether defendant was filling prescriptions at any other in-chain pharmacy. Upon discovering that defendant had an address in Virginia at the FBI Academy, the pharmacist's concern motivated her to report the situation to an inspector/pharmacist with the Rhode Island Board of Pharmacy (board).
Consequently, the board's inspector initiated a "routine check of [defendant's] prescription patterns," contacting several local pharmacies to obtain the originals of prescriptions written for him as well as copies of his active prescription profiles. The inspector learned that defendant had been receiving numerous prescriptions from multiple doctors and filling them at various local pharmacies. Additionally, one of defendant's prescription-filling pharmacists told the inspector that although defendant presented a prescription indicating that extra-strength medication ought to be prescribed (that is, with the letters "ES" following the medications name), the prescribing physician told the pharmacist that he had only prescribed regular-strength medication. The inspector independently verified this with the prescribing physician.
Thereafter, the inspector and the board's chief met with an East Greenwich Police Department detective and gave him their documentation "for further investigation and possible prosecution." The items they turned over to the detective included potentially-altered prescriptions and defendant's prescription profiles from five pharmacies. According to the detective, the board's inspector and chief told him that "their suspicions were increased when they were also told [by area pharmacists that] the [defendant] pays in cash for the medication and requests only brand name medication." After discovering that defendant was a DEA Special Agent, the East Greenwich Police Department turned the case over to the DEAs Office of Professional Responsibility.
The Office of Professional Responsibility interviewed several pharmacists who had filled defendant's prescriptions, obtained prescriptions written for him, and interviewed several of his prescribing physicians to determine whether defendant had altered any of their prescriptions. Two physicians noted discrepancies. After conducting a couple of interviews with the pharmacists, the DEA requested the investigatory assistance of the Rhode Island State Police, which thereafter assisted the DEA in interviewing other of defendant's pharmacists and prescribing physicians.
As part of its investigation, the DEA requested that the Rhode Island Department of Health reveal which schedule II or III controlled substances defendant received. The Department of Health responded by providing a report listing nine prescriptions filled at six pharmacies between August 1997 and April 1998. The DEA also contacted local branches of pharmacy chains and obtained defendant's prescription profiles from those branches which had filled a prescription for him. The DEA similarly contacted independently run pharmacies and obtained like profiles. Thereafter, the DEA visited each of the identified pharmacies and seized defendant's prescriptions. Finally, the DEA interviewed defendant's prescribing physicians and took statements regarding their prescriptions.
The defendant argues that this investigation violated his rights under the Confidentiality Act and thus "the information disclosed by the [initially-complaining] pharmacist . . . should be suppressed and all information derived from that information should be suppressed, as well." In support, defendant argues that although section 5-37.3- 4 (b)(4) of the Confidentiality Act allows confidential health-care information to be released without consent "[b]y a health care provider to appropriate law enforcement personnel . . . or to appropriate law enforcement personnel if the patient has or is attempting to obtain narcotic drugs from the health care provider illegally," a pharmacist is not a health-care provider, see G.L. 1956 § 5-37.3-3 (4) (amended by P.L. 1998, ch. 167, § 1, effective July 7, 1998, to include pharmacists in definition of "health care provider");Washburn v. Rite Aid Corp., 695 A.2d 495, 498-99 (R.I. 1997), and thus disclosure by them was not allowed without his consent. At the least, defendant argues, his health care providers (that is, his doctors) violated his privacy rights through their conversations with the DEA, which according to defendant has no jurisdiction over this matter because no federal law regulates his alleged conduct and thus the DEA cannot be "appropriate law enforcement personnel" for purposes of § 5-37.3-4 (b)(4). The state responds by alleging that pharmacies are third parties within the Confidentiality Act, see G.L. 1956 § 5-37.3- 3 (14); Washburn v. Rite Aid Corp., 695 A.2d 495, 498-99 (R.I. 1997), and thus disclosure pursuant to that act was proper. Furthermore, the state argues that "[t]he entire regulatory scheme in this area obviously envisions that law enforcement will have access to these types of records to investigate possible violations of the [Rhode Island] Controlled Substances Act," chapter 28 of title 21.
Following the lead of the parties, the Court assumes that defendants pharmacists and doctors released confidentiai health-care information. Furthermore, the Court assumes that such releases occurred during each stage of the investigation leading to the charges against defendant. Even so assuming, however, defendant's motion to suppress must be denied because (1) his rights under the Fourth Amendment to the United States Constitution[2] (Fourth Amendment) were not violated, (2) he does not argue that he had any greater rights under Article 1, section 6 of the Rhode Island Constitution[3] (section 6), and (3) Rhode Island law does not require (or, indeed, even allow) this Court to suppress illegally obtained evidence if the illegality results solely from the violation of a state statute.
 Analysis
Notwithstanding that defendant's motion to suppress does not particularly allege a violation of the Fourth Amendment, the Court reads his motion liberally and concludes that it ultimately asserts violations of the Fourth Amendment since, as discussed below, evidence obtained "merely" in violation of a state statute has long been admissible in Rhode Island. Furthermore, and even though "[t]he rights guaranteed by th[e] [Rhode Island] Constitution are not dependent on those guaranteed by the Constitution of the United States," R.I. Const. art 1, § 24;see also State v. Bjerke, 697 A.2d 1069, 1073 (R.I. 1997) ("[w]e recognize our power to afford greater protections under the Rhode Island Constitution"), because the "`[t]he decision to depart from minimum standards and to increase the level of protection should be made guardedly and should be supported by a principled rationale,'" State v. Bjerke, 697 A.2d 1069, 1073 (RI. 1997),[4] of which defendant offers none, the Court considers the prohibitions against unreasonable searches and seizures of the Fourth Amendment and section 6 to be coterminous for present purposes and will thus measure defendants request for suppression solely against the Fourth Amendment.[5]
But before doing so, and as mentioned above, the Court observes that the law in Rhode Island has long been that evidence obtained illegally, yet not in violation of the Fourth Amendment or section 6, is admissible in a criminal prosecution, see Statev. Olynik, 83 R.I. 31, 37, 40-41, 113 A.2d 123, 127-28 (1955) ("section 6 does not purport to be self-enforcing, nor does it contain any prohibition, either in express language or by necessary implication, against the admission in a prosecution by the state of illegally obtained evidence"); State v. Hiliman,84 R.I. 396, 398-99, 125 A.2d 94, 96 (1956) (Olynik "approved the common-law rule which does not exclude illegally obtained evidence, if it is otherwise relevant and material"); State v.Davis, 105 R.I. 247, 252, 251 A.2d 394, 397 (1969) ("any evidence taken by or through an illegal search or seizure would be excluded only where the search was illegal as a violation of art. I, sec. 6, of our Constitution [which] . . . has been construed as having the same effect as the fourth amendment"); State v.Timms, 505 A.2d 1132, 1137 (R.I. 1986) ("[t]he exclusionary rule protects the individuals reasonable expectation of privacy . . . by prohibiting the use, at trial, of evidence obtained by illegal searches and seizures in violation of a person's constitutionalrights") (emphasis added). And although G.L. 1956 § 9-19-25
"constitute[s] a statutory rule of evidence which supersedes the rule stated in the Olynik case," it requires suppression only in instances of constitutional violations and "does not affect in any manner th[e] court's construction of sec. 6," State v.Hillman, 84 R.I. 396, 399, 125 A.2d 94, 96 (1956); see also Statev. Spratt, 120 R.I. 192, 196, 386 A.2d 1094, 1096 (1978) ("the legislative purpose [in enacting § 9-19-25] can be reasonably construed as intending to supply a rule of evidence that would make inadmissible that which this court had held admissible inOlynik"); State v. Davis, 105 R.I. 247, 252, 251 A.2d 394, 397 (1969) (§ 9-19-25 "appears to constitute a legislative declaration of a rule of exclusion consistent with that imposed upon the states in Mapp v. Ohio, . . . [i]n other words, any evidence taken by or through an illegal search or seizure would be excluded only where the search was illegal as a violation of art. I, sec. 6"). Thus, the common-law rule of admissibility still applies in Rhode Island to evidence obtained illegally, yet not in violation of the Forth Amendment or section 6. Moreover, because the Confidentiality Act does not provide for the suppression of evidence obtained in violation of it, this Court is without authority to suppress such evidence, see State v.Olynik, 83 R.I. 31, 41, 113 A.2d 123, 128 (1955) (court's "duty [is] to refrain from incorporating by judicial implication into sec. 6 language that would abrogate a rule of evidence which has met with approval in this state both under the charter and the constitution"); State v. Jackson, 570 A.2d 1115, 1117 (R.I. 1990) (declining to "create an exclusionary rule where the Legislature has seen fit not to do so"). Therefore, even assuming that defendant's rights under the Confidentiality Act were violated, suppression would be required only if defendant's Fourth Amendment rights were concomitantly violated and it is to that question that the Court now turns.
"The Fourth Amendment protects against state intrusions into legitimate expectations of privacy." State v. Guido,698 A.2d 729, 733 (R.I. 1997). "The expectation must be one actually held by the defendant and one that society at large would recognize as reasonable" Id. Determining whether a defendant had an actual expectation of privacy "can be made by examining what actions taken by a defendant manifest his belief that he has some expectation of privacy," State v. Wright, 558 A.2d 946, 948-49 (R.I. 1989). Here, defendant relies exclusively on the privacy rights afforded him by the Confidentiality Act to establish that he had a Fourth Amendment reasonable expectation of privacy in his prescription records.
Our Supreme Court has observed that although an individual possesses some "protected interest in his or her medical records, . . . there is no constitutional right of privacy." Inre John Doe Grand Jury Proceedings, 717 A.2d 1129, 1136 (R.I. 1998) (citing State v. Guido, 698 A.2d 729, 738 (R.I. 1997)); seealso State v. McGoff, 517 A.2d 232, 234 (R.I. 1986) ("`the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purposes and the confidence placed in the third party will not be betrayed'"); Whalen v. Roe,429 U.S. 589, 603-04, 97 S.Ct. 869, 878-79, 51 L.Ed.2d 64 (1977) (limited official access to prescription records for dangerous drugs does not implicate patients privacy interests). As such, and for reasons akin to those that our high Court relied upon to conclude that the defendant in Guido had no legitimate expectation of privacy, this Court decides that defendant here similarly had no such expectation in his prescription records because they "were produced by medical personnel for their use in providing medical treatment. These were not defendant's personal papers created or kept by him [and he] . . . can demonstrate neither ownership nor possession," Guido, 698 A.2d at 734 (citingState v. McGoff, 517 A.2d 232 (R.I. 1986) and United States v.Miller, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976)); seealso Stone v. City of Stow, 593 N.E.2d 294, 301 (Ohio 1992) ("Whatever privacy interest the patients and physicians possess in these prescription records is limited to the right not to have the information disclosed to the general public. Disclosures to police officers, or to officials of the State Pharmacy Board, do not violate that right. Because the patients and physicians have no reasonable expectation of privacy in prescription records, . . . their Fourth Amendment challenge cannot succeed."). But compare State v. Welch, 624 A.2d 1105, 1109 (Vt. 1992) ("reject[ing] defendants claim that her privacy interest in the pharmacy records is predicated upon doctor-patient confidentiality," yet holding that under Vermont Constitution "defendant does have a privacy interest [in her pharmaceutical records] that derives from her expectation that those records cannot be arbitrarily disclosed").
Finally, the Court notes that Rhode Island has adopted the Uniform Controlled Substances Act, chapter 28 of title 21, which must be "interpreted and construed as to effectuate its general purpose," G.L. 1956 § 21-28-1.01 (A). One of its general purposes is to "develop a system of tracing the flow of substances in commerce and in health as to prevent their improper diversion," G.L. 1956 § 21-28-1.01 (B)(4). And in furtherance of that purpose "apothecaries[6] shall keep records of all controlled substances . . . disposed of by them," G.L. 1956 §21-28-3.14, which records "shall at all times be open to inspection by the director of health and by the authorized agents of said director." G.L. 1956 § 21- 28-3.17. Moreover, prescriptions are required to be "retained on file by the proprietor of the pharmacy in which it was filled for a period of two (2) years so as to be readily accessible for inspection by any public officer or employee engaged in the enforcement of this chapter." G.L. 1956 § 21-28-3.18 (c). And it is "the duty of all peace officers within the state, and of all prosecuting officers, to enforce all provisions of this chapter . . . and to cooperate with all agencies charged with the enforcement of the laws of the United States." G.L. 1956 § 21-28-5.01. Although general release by those allowed to inspect such records is prohibited, see G.L. 1956 §§ 21-28-4.18 5.10, the foregoing provisions (which defendant does not challenge) further undermines defendant's implicit argument that he had a reasonable expectation of privacy, protected by the Fourth Amendment, in his prescription records.[7]
 Conclusion
Even assuming that the defendant's statutory privacy rights were violated, because he had no Fourth-Amendment reasonable expectation of privacy in his prescription records his motion to suppress is denied.
[1] Pharmacies dispensing prescriptions are required to maintain "patient profiles." The pharmacist is required to make a reasonable effort to obtain, record, and maintain the patient's full name, address, telephone number, age, and gender. Also to be maintained is a list of all prescriptions obtained at the pharmacy within the preceding twelve months, showing the prescription number; name, strength. and quantity of drug dispensed: date received; name of practitioner; and pharmacist comments relevant to patient's drug therapy. See 16 C.R.I.R. 14 130 001-25, § 13.8.1.
[2] The Fourth Amendment provides in part that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."
[3] Section 6 provides in part that "[t]he right of the people to be secure in their persons, papers and possessions, against unreasonable searches and seizures, shall not be violated."
[4] See generally State v. Werner, 615 A.2d 1010, 1014 (RI. 1992) ("the Fourth Amendment provides ample protection against unreasonable searches and seizures, and state courts should respect the manner in which it is interpreted by the Supreme Court"); State v. Mattatall, 603 A.2d 1098, 1113 (R.I. 1992) ("this court has, with very few exceptions, followed the opinions of the United States Supreme Court whether premised on the Fourth Amendment . . ., or on our own statutory exclusionary rule").
[5] The Court also considers G.L. 1956 § 9-19-25 and Rule 41 (f) of the Superior Court Rules of Criminal Procedure to be coterminous with the Fourth Amendment for present purposes. Although our Supreme Court has observed that § 9-19-25
"reflects our legislature's clear intention to provide independent vitality to art. I, sec. 6, in guarding the privacy interests of the citizens of this state," State v. von Bulow,475 A.2d 995, 1020 (R.I. 1984), it "has never acquired or developed an independent body of jurisprudence." Stare v. Mattarall,603 A.2d 1098, 1113 (R.I. 1992). And since no argument is made to the contrary, the Court concludes that the illegality mentioned in Rule 41 (f) ("[a] person aggrieved by an unlawful search and seizure may move . . . to suppress for use as evidence anything so obtained on the ground that (1) the property was illegally seized without warrant"), refers solely to constitutional violations.
[6] "`Apothecary' means a registered pharmacist . . . and, where the context so requires. the owner of a licensed pharmacy." G.L. 1956 § 21-28-1.02 (3).
[7] Although the Court acknowledges concerns regarding the impact governmental record-keeping requirements should have on whether one has a reasonable expectation of privacy, see Wayne R. LaFave, 1 Search and Seizure § 2.7 (c), 634 (3d ed. 1996) ("surely the Katz expectation of privacy cannot be defeated in this fashion[;] `[i]f it could, the government could diminish each person's subjective expectation of privacy merely by announcing half-hourly on television that . . . we were all forthwith being placed under comprehensive electronic surveillance'"), because defendant does not challenge these provisions, the Court accepts them at face value. See RhodeIsland Insurers' Insolvency Fund v. Leviton Manufacturing Co.,716 A.2d 730, 734 (R.I. 1998) ("acts of the Legislature enjoy the presumption of constitutionality").