STATE

v.

Stephen R. **MATTATALL.**

No. 85–149–C.A.

Supreme Court of Rhode Island.

June 9, 1986.

---

Arlene Violet, Atty. Gen., Joel S. Chase/Constance Messore, Sp. Asst. Attys. Gen., for plaintiff.

William F. Reilly, Public Defender, Janice M. Weisfeld/Barbara Hurst, Asst. Public Defenders, for defendant.

## OPINION

WEISBERGER, Justice.

This case comes before us on the defendant's appeal from a judgment of conviction of second-degree murder entered after a jury trial. Thereafter, the trial justice denied the defendant's motion for new trial and sentenced him to a term of forty years' imprisonment of which ten-years were sus-

pended. The trial justice further imposed an additional ten year sentence upon the defendant, Stephen R. Mattatall, as a habitual offender. We reverse the conviction. The facts of the case insofar as pertinent to this opinion are as follows.

On the morning of September 24, 1982, defendant's wife found the body of John Scanlon on the kitchen floor of the Mattatalls' Warwick dwelling. Scanlon had apparently been shot in the face. A .22-caliber pistol was visible beneath the body. Doctor Loren J. Mednick, an assistant medical examiner for the state, later found that Scanlon had died between midnight and 4 a.m. on September 24, 1982, by reason of a fatal gunshot wound to the cheek.

At about 9:15 a.m. Sergeant Ernest Pierce of the Warwick police department arrived at the Mattatall home and observed that defendant was extremely agitated. The sergeant, admonishing defendant to sit down on the couch, asked him some questions about the .22-caliber gun but received no definitive reply. At this point Lieutenant James J. Godbout, who was in charge of the investigation, instructed Sergeant Pierce to have Mattatall transported to police headquarters in order to further the investigation as well as to get statements from Mattatall. Lieutenant Godbout testified that Mattatall was not at liberty to refuse his removal to the police station and presumably was not free to depart from the station until the investigative interrogation had been completed. Patrolman Ernest Heon drove defendant to the station in a police cruiser and then led him to an interrogation room within the detective division.

In the interrogation room Detective Richard Johnson admonished defendant of his *Miranda* rights at about 11 a.m. on September 24, 1982. In response to these admonitions, defendant declined to sign a waiver-of-rights form. Detective Johnson continued to question Mattatall, who informed the detective that he and Scanlon had been drinking together, that the .22-caliber gun was not owned by defendant, but that defendant did own a .357–magnum pistol. The defendant suggested that Scanlon had committed suicide. After about fifteen or twenty minutes of interrogation defendant told Detective Johnson that he no longer wished to discuss the matter with him.

Lieutenant Godbout returned to the police station and brought defendant to a larger interview or interrogation room. The lieutenant advised defendant of his *Miranda* rights again at about 12:30 p.m., and Matattall signed a waiver-of-rights form at that time. Mattatall stated that he and Scanlon had been drinking the night before and that Scanlon had asked him if he owned a gun. The defendant stated that he gave Scanlon a .22–caliber gun with a single bullet and then went upstairs to bed. Thereafter, when defendant refused to sign a consent form to allow a neutron-absorption test to be administered, a warrant was obtained to perform this test in order to determine whether defendant had recently fired a gun. The test was performed and concluded at about 3 p.m. The results were negative. Thereafter, Lieutenant Godbout continued his interrogation, and Mattatall admitted that he owned a .357 magnum as well as the .22–caliber gun. The defendant refused to tell the police where the magnum was located but signed a consent form allowing the police to search his home for the gun.

At this point, defendant became more and more agitated, began to cry, and then stated that he was showing Scanlon how to work the .22-caliber gun, and that it had accidentally discharged, and struck Scanlon in the face. Lieutenant Godbout then asked defendant why he had not called the rescue squad or the police at that point. Mattatall replied that he had nothing further to say. At this point questioning was terminated, and defendant was allowed to call his attorney. Statements taken during the course of this interrogation were introduced into evidence during the trial after a motion to suppress was denied. During the suppression hearing the prosecution

took the position that since Mattatall was not under arrest when he was taken to the station and was not a suspect at that time, it was unnecessary to establish probable cause in order to justify his transportation to police headquarters and his seizure or custody for investigative purposes. The trial justice agreed that Mattatall was not arrested. No ruling was requested or made on the issue of probable cause for the detention.

Certain statements made by defendant to one John Carney after Mattatall had been arraigned and after counsel had entered an appearance on behalf of defendant also were admitted during the course of the trial. More details concerning these statements will be set forth later in this opinion. It is sufficient at this point to indicate that the conversations between defendant and Carney were overheard by the police with Carney's consent.

In support of his appeal defendant raises seven issues, only two of which will be dealt with in this opinion. Further facts will be supplied as necessary in dealing with these issues.

### I

For purposes of this opinion, the court must assume that at the time Mattatall was ordered to be transported to Warwick police headquarters, the police had insufficient evidence to constitute probable cause to believe that defendant was responsible for the homicide, or indeed that a homicide had been committed. Their purpose in transporting Mattatall to the police station was investigative only. They did not suspect him of homicide or murder. Such suspicion arose later because of defendant's responses to interrogation, together with the finding of a .357 magnum in a stream near Mattatall's house and certain ballistic findings concerning the fact that the gunshot wound to the victim was caused by a .357 magnum. Therefore, this court must conclude as a matter of fact that Mattatall was brought involuntarily to the police station for interrogation even though the police did not suspect him and had no probable cause to believe that he was guilty of a crime. The purpose of this removal was investigative and was not considered by the police to be a full custodial arrest. The arrest took place later at the police station after Mattatall made certain statements that he might have intended to be exculpatory but which led the police to believe that he was involved in a homicide. We shall also assume for the purpose of this opinion that defendant was properly admonished of his *Miranda* rights and that his responses to interrogation were voluntary as found by the trial justice.

The Supreme Court of the United States has unequivocally held in a series of opinions that the fruits of an illegal seizure or detention are inadmissible in evidence, whether obtained by interrogation or otherwise. *Taylor v. Alabama,* 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982); *Dunaway v. New York,* 442 U.S. 200, 99 S. Ct. 2248, 60 L.Ed.2d 824 (1979); *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L. Ed.2d 416 (1975); *Davis v. Mississippi,* 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969); *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

■ The foregoing cases establish the principle that if a person is detained in violation of the rights guaranteed by the Fourth Amendment to the Constitution of the United States, any fruits of the illegal detention are inadmissible even if they are oral statements, as in *Taylor, Dunaway,* and *Brown,* for which adequate *Miranda* warnings had been given for Fifth Amendment purposes. It was also established in *Davis v. Mississippi,* as well as in *Taylor v. Alabama,* that the taking of fingerprints during such an illegal detention will result in the exclusion of these prints from evidence.

The state argues that since Mattatall was not under full custodial arrest, his statements, if given voluntarily, should be admissible. This argument was presented in *Dunaway v. New York, supra,* and was

rejected. In that case the Court observed, after contrasting such investigative detention from the brief investigative stop approved in *Terry v. Ohio,* 392 U.S. 1, 88 S. Ct. 1868, 20 L.Ed.2d 889 (1968), as follows:

> "[T]he detention of petitioner was in important respects indistinguishable from a traditional arrest. Petitioner was not questioned briefly where he was found. Instead, he was taken from a neighbor's home to a police car, transported to a police station, and placed in an interrogation room. He was never informed that he was 'free to go'; indeed, he would have been physically restrained if he had refused to accompany the officers or had tried to escape their custody. The application of the Fourth Amendment's requirement of probable cause does not depend on whether an intrusion of this magnitude is termed an 'arrest' under state law. The mere facts that petitioner was not told he was under arrest, was not 'booked,' and would not have had an arrest record if the interrogation had proved fruitless, while not insignificant for all purposes * * * obviously do not make petitioner's seizure even roughly analogous to the narrowly defined intrusions involved in *Terry* [v. *Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)] and its progeny. Indeed, any 'exception' that could cover a seizure as intrusive as that in this case would threaten to swallow the general rule that Fourth Amendment seizures are 'reasonable' only if based on probable cause." *Dunaway,* 442 U.S. at 212–13, 99 S.Ct. at 2256–57, 60 L.Ed.2d at 835–36.

The Court, in *Dunaway,* rejected the same distinction between investigation and accusation that it had rejected ten years earlier in *Davis v. Mississippi, supra.* In *Davis,* a young man, along with forty or fifty other black youths, was detained at a police station incident to a rape investigation, was fingerprinted, and was then released. No probable cause was established for the seizure and detention of Davis. The state argued that Davis was not arrested but only detained briefly for investigative purposes with a minimum intrusion during the course of fingerprinting. The Court responded with this statement:

> "[T]o argue that the Fourth Amendment does not apply to the investigatory stage is fundamentally to misconceive the purposes of the Fourth Amendment. Investigatory seizures would subject unlimited numbers of innocent persons to the harassment and ignominy incident to involuntary detention. Nothing is more clear than that the Fourth Amendment was meant to prevent wholesale intrusions upon the personal security of our citizenry, whether these intrusions be termed 'arrests' or 'investigatory detentions.'" *Davis,* 394 U.S. at 726–27, 89 S.Ct. at 1397, 22 L.Ed.2d at 680–81.

■ There seems no question that in the case at bar defendant was seized for Fourth Amendment purposes and was detained for a substantial period of time during which he was interrogated. There is no question that the fruits of this interrogation assisted in the establishment of probable cause for his arrest and were used against him at the trial in order to obtain his conviction.

This court has had occasion to consider such detention in *State v. Bailey,* 417 A.2d 915 (R.I. 1980). In that case, we established the criteria for determining whether an arrest or seizure has taken place for Fourth Amendment purposes. These factors included: "[1] the extent to which the person's freedom of movement has been curtailed and the degree of force used by the police * * * [2] the belief of a reasonable innocent person [concerning his/her inhibition of movement] in the same circumstances * * * and [3] [the question of] whether the person had the option of not going with the police * * * ." *Id.* at 917–18. Applying these factors to the instant case, one is compelled to conclude that Mattatall's freedom of movement was curtailed, certainly from the moment that Lieutenant Godbout ordered that he be

transported to the police station. Mattatall did not have the option of declining to go with the police. Moreover, the fact that there were a number of police officers at the scene would have caused a reasonable person to conclude that he was subject to official restraint. Although the police did not use physical force upon defendant and did not handcuff him, they did act under color of authority and under circumstances that would cause a reasonable person to conclude that refusal to accompany them would be ineffective.

Taking into account the relevant authorities cited above, we are of the opinion that the oral statements made by defendant during the course of his detention at the Warwick police station were the fruits of an illegal seizure in violation of the Fourth Amendment to the Constitution of the United States, and therefore, were inadmissible in evidence against him. The trial justice erred in admitting such statements on the ground that he found them to be voluntary for Fifth Amendment purposes.

## II

The defendant further contends that the admission into evidence of statements that he made to John Carney over the telephone were inadmissible as violative of his Sixth Amendment right to counsel pursuant to principles enunciated in *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), and reaffirmed in *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), and *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980), and most recently in *Maine v. Moulton*, — U.S. —, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985). The facts relating to the Carney telephone conversations may be briefly stated.

Carney testified that he had asked members of the Warwick police to come to his home because of threatening telephone calls that he had received from Mattatall. While the police were present at Carney's home on December 26 and 27, 1983, calls came in from Mattatall. At Carney's invitation, members of the Warwick police department listened to these conversations and heard Mattatall state to Carney that the victim's death was accidental and not suicidal and that Mattatall might have been involved in the accidental death. These statements were used against defendant at the trial. The parties stipulated that prior to these dates defendant had been arraigned on the charge of homicide and that counsel had appeared to represent him. Evidence indicates that the police officers who listened in on the conversations were aware of the pending homicide charges against Mattatall.

The state argues that this case is distinguishable from *Massiah* and *Henry* because in those cases federal officers had arranged for a person to listen to admissions made by a defendant who had been charged with a crime and for whom counsel had entered an appearance. The surreptitious "eavesdropping" had occurred under circumstances in which the officers had reason to believe that the listening individuals (a friend whose car was wired for sound in *Massiah* and a "sympathetic" fellow prisoner who listened in *Henry*) would elicit incriminating statements from the accused. Here the state argues that the officers were motivated to investigate a separate crime, that of threatening phone calls, not to obtain information concerning the pending charge. The state further contends that the police officers did not instigate the phone calls but only listened to calls initiated by Mattatall himself.

This case is very similar to *Maine v. Moulton, supra.* In that case police had learned from a codefendant turned informant that he suspected that he had received threatening telephone calls from an anonymous source concerning his pending charges. He also stated that Moulton had suggested the killing of a prosecution witness. The police then wired the codefendant for sound, with his consent, and recorded conversations between the codefendant and Moulton. During the course of these conversations, Moulton made a number of

incriminating statements concerning the pending charges. These statements were admitted against him at trial. Both the Supreme Judicial Court of Maine and the Supreme Court of the United States held that these statements were improperly admitted.

The Supreme Court of the United States, in passing upon the prosecution's argument that there was a duty and an appropriate interest in investigating new or additional crimes, made the following comment:

"The police have an interest in the thorough investigation of crimes for which formal charges have already been filed. They also have an interest in investigating new or additional crimes. Investigations of either type of crime may require surveillance of individuals already under indictment. * * * In seeking evidence pertaining to pending charges, however, the Government's investigative powers are limited by the Sixth Amendment rights of the accused. To allow the admission of evidence obtained from the accused in violation of his Sixth Amendment rights whenever the police assert an alternative, legitimate reason for their surveillance invites abuse by law enforcement personnel in the form of fabricated investigations and risks the evisceration of the Sixth Amendment right recognized in *Massiah*. * * * Consequently, incriminating statements pertaining to pending charges are inadmissible at the trial of those charges, notwithstanding the fact that the police were also investigating other crimes, if, in obtaining this evidence, the State violated the Sixth Amendment by knowingly circumventing the accused's right to the assistance of counsel." —— U.S. at ——, 106 S.Ct. at 489–90, 88 L.Ed.2d at 498–99.

The fact that Mattatall had not been indicted in this case is of no consequence since the Sixth Amendment right to counsel applies as soon as adversarial judicial proceedings have commenced. *Brewer v. Wil-liams, supra; Kirby v. Illinois*, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972). There is no question that the Sixth Amendment right to counsel was applicable in this case, that counsel had entered an appearance in the case, that the police knew or were chargeable with knowledge of this set of facts, and that they knowingly listened to conversations in which defendant made incriminating statements concerning pending charges. However justifiable it may have been for the police to take this action for the purpose of investigating other criminal conduct, the plain message of *Moulton* is that the prosecution may not use evidence obtained regarding the pending charges against the defendant at his trial. Whether the police use a telephone, an electronic device, or a jailmate to obtain this information is not controlling. The doctrine established by the Supreme Court of the United States requires that such information not be used in evidence against the defendant on the charge in respect to which the right to counsel has previously attached. Therefore, testimony concerning the statements made to Carney should not have been admitted into evidence.

Because of the conclusions that we have reached in regard to the issues previously discussed in this opinion, it is unnecessary for us to discuss and analyze the additional five issues that have been raised by the defendant. Obviously, since the conviction of the defendant on the murder charge is to be vacated, the consecutive sentence imposed as a habitual offender must be vacated as well. The other issues raised do not require discussion at this time since they will not necessarily be presented in the same fashion at a subsequent trial.

For the reasons stated, the defendant's conviction is hereby vacated and the papers in the case are remanded to the Superior Court for a new trial.

BEVILACQUA, C.J., did not participate.