STATE

v.

William MEAD.

No. 87–361 C.A.

Supreme Court of Rhode Island.

July 11, 1988.

James E. O'Neil, Atty. Gen., Thomas Dickinson, Asst. Atty. Gen., for plaintiff.

Barbara Hurst, Asst. Public Defender, for defendant.

## OPINION

KELLEHER, Justice.

The defendant, William Mead (Mead), is before us on appeal after a Superior Court jury returned guilty verdicts on charges that the defendant had committed first-degree murder, burglary, first-degree sexual assault, robbery, and kidnaping.

The record before us presents a rather unusual set of coincidences. On February 20, 1986, Mead went to East Providence police headquarters and complained about being harassed by some fellow employees because he had been found "in a stolen car." Mead was told that if he wished to press this complaint, it would be necessary for him to return to headquarters and fill out a report.

On February 21, 1986, at approximately midnight, a neighbor of the deceased looked out her bedroom window and observed a car coming down the deceased's driveway. The neighbor, who was familiar with the deceased's daily routine, thought the car's departure was strange because the deceased usually retired at approximately 11:30 p.m. The following morning the neighbor looked across the street to the deceased's driveway and noticed that the garage door was open and the deceased's new car was nowhere to be seen. After an hour-long wait for the deceased's return, the neighbor called the deceased's daughter. The neighbor, at the request of the daughter, went to the mother's residence to see if anything was amiss. The neighbor soon returned to her home and her report caused the daughter to call the East Providence police.

On February 22, 1986, the East Providence police department received a telephone call in the early afternoon from the daughter who reported what she had heard from the neighbor. Upon arriving at the mother's residence, the police soon learned that both the mother and her car were missing. They found what appeared to be a pool of blood on the kitchen floor, together with several pieces of broken china. A brick was also found lying on the floor, and the telephone cord had been cut.

Police questioned the neighbor who told the police that about "a year or so before," she had observed a "tall, slender, black man leave a note at [the mother's] door." The neighbor noted that when the visitor left, he ran through the backyard into a nearby white house.

The daughter told the police that while talking to her mother by phone on the evening of February 21, 1986, her mother described an incident where a week earlier she had been frightened by "a tall, black youth at her door." According to the daughter, when the visitor asked to use the phone, her mother refused to grant the request. Then, according to the daughter, the visitor asked her mother to give him a ride in her new car because his car was broken down.

Relying in part on this information, the police questioned Mead's mother, who lived in the white house which we referred to earlier. A detective was sent to Mead's place of employment on Dexter Road in East Providence to determine his current address. The detective was met by a company representative who told him that Mead had been sleeping in the guard shack on the premises that week. This officer testified that when he knocked at the door of the shack,

"[w]ithin * * * a few seconds or so, a black male appeared at the door. I identified myself as an East Providence police officer. I asked what his name was. He said William Mead. Then he stated to me at this time, 'This must be in reference to the incident that happened yesterday. I was supposed to go into the station and make a statement. Do you want me to come with you now?' I said 'Yes.'"

This detective testified that Mead, of his own volition, returned with him to the police station. The detective also stressed that when he went to defendant's place of employment, he had no knowledge of any details about the investigation except that his task was to determine Mead's address. The detective also noted that he was totally unaware of what incident Mead was talking about when he volunteered to go to the station.

Detective Donald Tremblay testified that when Mead arrived at the police station, it was approximately 6:15 p.m. He was not handcuffed or restrained in any way, nor was he closely watched by any of the officers. This detective questioned him after first advising Mead of his constitutional rights at about 6:20 p.m. Tremblay told Mead that he was a suspect in the crime of larceny of an automobile. Mead denied any knowledge regarding the missing vehicle, although he acknowledged he knew the mother.

Some twenty minutes later, Tremblay left the interrogation room and learned from another officer that the police had recovered the mother's car in back of the warehouse where Mead worked. The car contained a dried substance that appeared to be blood.

The detective again advised Mead of his rights and Mead signed a second rights-waiver form at approximately 7:30 p.m. Ten or fifteen minutes later, Mead gave a confession. In his confession that was introduced at trial, Mead stated that he decided to steal a car. He remembered the woman who lived alone who had the blue Ford Escort. He knew of her from having lived in the neighborhood. We see no ne-cessity for giving a detailed description of Mead's violent and gruesome acts, which were set forth in his confession. The pertinent facts are as follows.

Mead gained entry into the mother's residence by picking up a rock or a brick and smashing the glass panes of the storm door and the interior door. He physically assaulted the mother and asked where her car keys were. After she surrendered the keys, she was told that she was going for a ride, and then he drove her to the area behind his place of employment. When he got to an area that was out of sight of his place of employment, he forced the mother to have sexual intercourse with him and then grabbed her by the throat and strangled her with the scarf she was wearing.

The medical examiner reported that the mother died of "asphyxia due to ligature strangulation." The mother suffered a fractured rib, and scattered bruises that were described by the medical examiner as "defense-type wounds" that occurred when "the arms and hands would be held to ward off an assailant."

Mead's appellate counsel raises four issues—they relate to

1. The trial justice's allowing evidence relating to two previous incidents involving a black male at the mother's home.
2. The denial of the defense motion to suppress Mead's statements.
3. The alleged inflammatory and prejudicial remarks made by the prosecutor in the final argument.
4. The trial justice's refusal to instruct the jury that police officers' testimony is to be assessed by the same standards that are applied to other lay witnesses' testimony.

■ Mead, who is black, claims there was a complete dearth of evidence linking him to the two episodes relative to the "young black male" who came to the door of the mother's home. One incident occurred a year prior to the homicide. The other incident, however, occurred just one week prior to her death. In fact, Mead admitted at the police station that he had gone to the mother's home a week before

the homicide to ask about borrowing the car. Certainly Mead's testimony and that of the mother's daughter provided a link between the crimes that occurred and Mead. The admission of this evidence might not have been crucial to the state's case, but it did have some degree of relevancy and it certainly did not constitute abuse of discretion to admit it. *See State v. Nordstrom*, 529 A.2d 107, 114 (R.I. 1987); *State v. Gordon*, 508 A.2d 1339 (R.I. 1986).

■ In regard to the year-old incident, it would appear to have had little relevance in the absence of any proof that Mead was the man involved. The question before us is whether the evidence of the first visit was harmless. We conclude that it is reasonably possible that such evidence would influence an average juror on the ultimate issue of guilt or innocence. However, the error is harmless. The evidence establishing defendant's guilt is overwhelming. *State v. Burns*, 524 A.2d 564, 569–70 (R.I. 1987).

■ In faulting the denial of the motion to suppress the evidence contained in Mead's statement to the police, his counsel argues that the detective who first met Mead at his place of employment in the guard shack misled him by fostering Mead's belief that he was going to the station to file a formal harassment complaint.

There is no doubt that an investigative detention without probable cause could constitute illegal seizure under the Fourth Amendment to the United States Constitution. *State v. Mattatall*, 510 A.2d 947 (R.I. 1986). In *Mattatall* we held that although not formally arrested, Mattatall had been seized for Fourth Amendment purposes when he was being questioned at the police station. Our conclusion was based upon the following factors: he was ordered to go to the police station without the option of his declining; his freedom of movement was curtailed; and there were a number of police officers at the scene. 510 A.2d at 951–52.

A contrast to *Mattatall* is *State v. Ferola*, 518 A.2d 1339 (R.I. 1986), in which this court found that there was no illegal seizure or arrest of Ferola when he was being questioned by the police at the station. We pointed out that one is seized within the meaning of the Fourth Amendment if, in view of all the circumstances surrounding the episode, a reasonable person would have to believe he was not free to leave. *Ferola*, 518 A.2d at 1343. We found it significant that Ferola had been questioned several times previously and had been permitted to leave. Also, he was not told that he was under arrest, nor was there any evidence of coercion on the part of the police. On those facts we determined that Ferola did not have reason to believe his liberty would be restricted.

We believe that the issues presented in this case are closer on its facts to *Ferola* than to *Mattatall*. Mead voluntarily came to the police station; he was accompanied by a police officer; he was not physically restrained, photographed, or fingerprinted; and there was ample testimony that the police officers initially considered Mead free to go.

Although Mead was given a ride to the station in a police car, there is nothing to suggest that he was not free to leave by any other means, such as walking, calling a friend for a ride home, or taking public transportation.

The record does not even contain a hint that there was trickery when the detective agreed to transport Mead to the police station. The offer appears to have been spontaneous and unsolicited. We would also note that at the time police recovered the mother's blood-stained car in back of the warehouse some forty feet from where Mead had taken up residence, they then had probable cause to hold him. Consequently the only potential illegal seizure occurred during the time he was in the interrogation room being questioned about the larceny of the car before the car was discovered.

The record indicates that the inquiry about the larceny of the car began at approximately 6:20 p.m. and ended when Mead was asked to step into the interroga-

tion room at approximately 6:40 p.m. after another officer had discovered the missing vehicle. We have no doubt that the nature of his visit never changed during that twenty-minute interval from being a voluntary action to one that was a product of coercion.

As a result we cannot fault the trial justice's conclusion that Mead's statements were not the fruit of an illegal seizure, and we uphold their admission.

In her closing argument to the jury, the state prosecutor observed that

"we have all heard that the defendant, William Mead, has certain constitutional rights * * * but there are other rights here that are involved that I would like you to consider too, and that's the rights of the victim." Over defense counsel's objection the prosecutor continued:

"The rights of [the mother]. The rights of her daughter to have a mother to talk to on a Friday night. The rights of her grandchildren to have their grandmother * * * and the rights of you and I to be safe from this kind of conduct, which the defendant has committed."

In concluding her argument, the prosecutor again emphasized the "rights of [the grandmother] to spend her golden years alive; to spoil her grandchildren * * * to be alive today."

■ The state argues that Mead waived his right to be heard on this issue because his counsel failed to request a cautionary instruction. However, we believe that the remarks fall within the exception often stressed by this court—that a request for cautionary instructions will not be required when such a request will be futile. *State v. Lemon*, 478 A.2d 175, 181 (R.I. 1984). Here the trial justice on two occasions summarily overruled defendant's objections. Consequently there would have been little point in requesting a cautionary instruction.

■ We believe that the prosecutor's comments went beyond the bounds set for proper argument. Her remarks were obviously intended to arouse the sympathy and passion of the jurors. A criminal trial cannot be allowed to become like a day at a Roman Coliseum when an individual's fate was determined by the cheers or jeers of the crowd. A guilty verdict must be based upon the evidence and the reasonable inferences therefrom rather than on "an irrational response that may be triggered if the prosecution unfairly strikes an emotion in the jury." Appeals to the jurors' sympathy or emotions are to be rejected because they go beyond the facts of the case and the reasonable inferences to be drawn from such facts. *DeShields v. State*, 534 A.2d 630, 642 (Del. 1987). However, the error is harmless because of the overwhelming evidence of Mead's guilt.

■ Mead's claim that the trial justice erred in refusing to tell the jury that the testimony given by the police witnesses was to be subject to the same credibility-assessment principles applied to the other witnesses merits little discussion. The trial justice, in explaining the task of assessing credibility, referred the jury to such factors as the manner in which the witnesses testify, the presence or absence of candor on the part of the witnesses, any interest the witnesses might have had in the outcome of the case, and the presence or absence of other testimony that would serve to corroborate and support the testimony of a particular witness. We cannot fault the trial justice's efforts in this regard. Here the trial justice, when he dealt with the testimony given by experts from the Federal Bureau of Investigation and the deputy state medical examiner, emphasized that it was to be evaluated in the same manner as the testimony given by the other witnesses. Had the trial justice accepted Mead's request to charge, he would have implicitly pointed the finger of suspicion at the testimony given by the East Providence police. His rejection of the proposed suggestion was quite correct.

Accordingly, the defendant's appeal is denied and dismissed. The judgments of conviction appealed from are affirmed, and the case is remanded to the Superior Court.