**STATE**

v.

**Stephen R. MATTATALL.**

No. 89–307–C.A.

Supreme Court of Rhode Island.

Feb. 21, 1992.

James E. O'Neil, Atty. Gen., Annie Goldberg, Jeffrey Greer, Asst. Attys. Gen., for plaintiff.

Richard Casparian, Public Defender, Paula Rosin, Barbara Hurst, Asst. Public Defenders, for defendant.

## OPINION

SHEA, Justice.

This matter comes before the Supreme Court on the defendant's appeal from a judgment of conviction of second-degree murder entered after a jury trial. We affirm.

The travel of this case is lengthy and notable. On the morning of September 24, 1982, John Scanlon (Scanlon) was found dead in the home of Stephen R. Mattatall (Mattatall) in Warwick, Rhode Island. Mattatall was later indicted on murder and weapons charges. A jury found him guilty of second-degree murder, and Mattatall was sentenced to a term of forty years' imprisonment, ten years of which were suspended. The trial justice also imposed an additional ten-year sentence upon Mattatall as a habitual offender. Mattatall appealed his conviction to this court and we reversed and remanded the case for a new trial. *State v. Mattatall*, 510 A.2d 947 (R.I.1986). The United States Supreme Court, after granting Rhode Island's petition for certiorari, directed that we reconsider one aspect of our opinion in light of *Kuhlmann v. Wilson*, 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986). *Rhode Island v. Mattatall*, 479 U.S. 879, 107 S.Ct. 265, 93 L.Ed.2d 243 (1986). Upon reconsideration this court reaffirmed its initial ruling by vacating Mattatall's conviction and remand-

ing the case for a new trial. *State v. Mattatall*, 525 A.2d 49 (R.I.1987).

A second trial commenced in September 1987. However, because of Mattatall's conduct in the court room the trial justice held Mattatall in contempt twice and sentenced Mattatall to two consecutive six-month terms. Subsequently the trial justice declared a mistrial.

The trial was finally under way in June of 1988. At trial Sandra Scanlon (Mrs. Scanlon), the widow of the decedent, testified that at approximately midnight on September 23, 1982, her husband, Scanlon, telephoned to say that he would be home within a half-hour. Although Scanlon did not relate the location from which he was making the phone call, Mrs. Scanlon testified: "It sounded as though there was a crowd of people and some music, maybe a jukebox." When her husband failed to return home, Mrs. Scanlon called Mattatall's home; she related the substance of the conversation at trial:

"He seemed to be a little upset, slurred speech, he said that he had just gotten a Karate chop from one of these jerks. And, I, at that point Stephen Mattatall in the background asked John if he could talk with me on the phone and John told him no. * * * At that time I heard some scuffling noises, where maybe he tried to take the phone, whatever, and John said to put the pillow out for him. He would be home in a half-hour."

Mrs. Scanlon testified that although she tried to call back almost immediately, the line was busy. She continued calling for the next several hours, but the line remained busy until about 6 a.m., at which time the phone rang, but no one answered.

Scanlon was found dead on the kitchen floor of Mattatall's home that morning, September 24, 1982. Scanlon lay dead in a pool of blood after apparently having received a gunshot wound in the face. A .22-caliber pistol was visible beneath Scanlon's body. Phyllis Parente (Parente), Mattatall's then wife (they were divorced subsequent to Mattatall's indictment for murder), testified that when she entered through the back door of the house at approximately 9 a.m., she saw the body and blood on the kitchen floor. Parente related to the jury that on the evening of September 23, 1982, her husband asked her to drive him to the home of his recently deceased brother-in-law, Wayne Olson (Olson), allegedly to "take care of business for Wayne." Parente testified that she understood that her husband's "business" referred to some guns that Wayne Olson had owned. For this reason Parente refused to drive Mattatall. Later that evening, Mattatall told Parente that he had arranged for a ride with Scanlon. Between 10:30 and 11 p.m., she heard the "beep" of a car horn outside, and Mattatall left. Parente was awakened approximately an hour later when Mattatall and Scanlon returned. Both men were sitting at the kitchen table and talking. After she was introduced to Scanlon, Parente noticed two guns: one gun positioned in the center of the table and another gun in Stephen Mattatall's right hand. Parente testified that upon seeing the guns, she became frightened. She awakened her son, "grabbed the car keys, and left through the cellar out to the car." Upon returning to her home that next morning and discovering the apparently lifeless body of Scanlon on the kitchen floor, Parente immediately left the house and summoned her neighbor, James King (King).

King testified that he entered the residence and, after determining that Scanlon was dead, climbed upstairs and found Mattatall lying in bed. King told Mattatall that there was a dead man on the kitchen floor. At trial King described Mattatall's reaction to the news: "He didn't say too much of anything. He got out of bed. He walked downstairs. * * * He looked at the man on the floor, and he turned around, you know, I guess I was more excited than he was." After this confrontation Mattatall ordered King to leave the house.

King also testified that around 3:30 a.m. on the night in question he recalled hearing the gate between his house and Mattatall's house "clang" open and "clang" shut. He heard someone walk down his driveway to Brook Street and then around to Young

Orchard Street. It was along this same route that King led police officers during a search of the premises that subsequently turned up a sock containing live .357 ammunition. Moreover, King testified that he never heard Mattatall's dog, Tippy, bark at the person who walked through the gate that night, even though Tippy was "a good watch dog" and "would more than bark" at strangers who came close to Mattatall's property.

Lieutenant Donald Montgomery (Lieutenant Montgomery) was the first Warwick police officer to arrive at the Mattatall home. Lieutenant Montgomery observed Mattatall and described his demeanor to the jury: "[Mattatall] looked at the body just, I guess, nonchalantly, walked away back into the other part of the house. * * * [D]idn't appear that he really cared * * * [j]ust walked in, looked, and left again."

At approximately 9:15 a.m., Sergeant Ernest Pierce (Sergeant Pierce) of the Warwick police department arrived at the Mattatall home and observed that Mattatall was extremely agitated. After he asked Mattatall to sit down on the couch, Sergeant Pierce testified that Mattatall looked at Scanlon's body and stated, "[I] should not have shown him that gun last night." Sergeant Pierce then asked Mattatall whether he owned the .22–caliber handgun that had been retrieved from under Scanlon's body, to which question Mattatall responded, "I have no more to say about that gun."

When the bullet fragments were removed from Scanlon's head, the police determined that the bullet was larger than a .22–caliber. Relying on this information, the police conducted an extensive search of the premises. The search turned up a .357 magnum handgun hidden in shrubbery approximately 200 feet from the Mattatall home. It was during this search that police also retrieved the sock containing live .357 ammunition. Tests revealed that the bullet fragment taken from Scanlon's head came from the .357 revolver found by the police.

Doctor Loren Mednick (Dr. Mednick), an assistant medical examiner for the state, determined that Scanlon had died between midnight and 4 a.m. on September 24, 1982, from a fatal gunshot wound to the head. He testified that the bullet had passed through the left cheek, penetrated the bony portion of the skull, and entered the cranial cavity where it broke into a few fragments causing damage to the vital portions of the brain. Doctor Mednick testified that he believed that Scanlon's eyes were closed at the time the shot was fired, relying on the fact that he observed no injury to the eyeball or the eye socket area. Doctor Mednick further testified that he evaluated Scanlon's blood-alcohol level at .43 grams per one hundred milliliters of blood. Although he acknowledged that this was a significant level of alcohol that "more often than not" would cause a person to pass out, he testified that, in his opinion, the alcohol in no way contributed to Scanlon's death. Doctor Mednick remained certain that death resulted from a gunshot wound to the head.

The doctor explained to the jury that the bullet entered the head at a slightly upward angle almost perpendicular to the victim's face. He arrived at this conclusion by observing the pattern of injury peripheral to the wound. The injury exhibited "powder tatooing" or "powder stipling" as evidenced by a five-inch wide area of a "dot-like, reddish appearing hemorrhage." This injury pattern resulted from the unburned powder that was discharged by the gun when the fatal shot was fired. Doctor Mednick further testified that because the pattern was "nearly symmetrical," he was certain that the firearm had been fired with the barrel nearly perpendicular to Scanlon's cheek. When asked to give an opinion about the manner of death, Dr. Mednick testified: "Manner of death is homicide. It's my opinion."

Doctor Richard Wilkinson (Dr. Wilkinson), a senior criminologist at the Rhode Island State Crime Lab, conducted "powder pattern" tests by test firing the .357 magnum handgun. These tests enabled Dr. Wilkinson to determine that the weapon had been fired approximately eight to

twelve inches from Scanlon's face. He also conducted "tension tests" on the weapon and explained that the .357 magnum had a built-in safety feature to prevent accidental discharges during loading or by "hitting on the ground, or by hitting against some object * * *." Doctor Wilkinson further testified, "When you fire a weapon of this type, particularly a .357 magnum in a room, even a room such as this, the sound is quite loud."

Mattatall testified at trial. He explained that on the evening of September 23, 1982, he called to inform Scanlon that Olson had passed away. Scanlon had purchased the .357 magnum from Olson several days earlier, according to Mattatall, but had changed his mind and said he wished that he had bought the .22–caliber handgun instead.

When Scanlon arrived at Mattatall's home, they first went out to buy some beer. Upon returning to Mattatall's home, they sat in the kitchen and conversed for a while. Mattatall testified that the .357 handgun lay on the kitchen table. He also claimed to have shown Scanlon his son's pellet gun. Later, they went to Olson's house, and Mattatall retrieved the .22–caliber handgun from the garage.

At about midnight they went to a lounge called the Fireside, located about 100 yards away from Mattatall's house. Scanlon used the telephone in the hallway to call his wife. Mattatall testified that after a "fellow" he knew advised him that he ought to return home, he agreed and left the Fireside. Scanlon remained at the bar. Mattatall said he started drinking Scotch at home. At some point Scanlon returned from the bar after an alleged altercation with strangers had erupted in the parking lot. Mattatall testified that Scanlon then peered out the window and claimed to have seen somebody. Consequently Scanlon walked outside, and soon after, Mattatall heard a gunshot. Scanlon retreated to the kitchen and reported that he had fired a shot, but the bullet had missed the stranger in the dark. Nevertheless, Scanlon remained determined "to go get these guys," Mattatall explained.

Mattatall testified that although he was hesitant to involve himself in Scanlon's troubles, he agreed to accompany Scanlon on a mission to obtain more beer—Scanlon was not a drinker of Scotch. They decided to drive in Scanlon's car to a bar called the 529 Club. Scanlon first drove through the parking lot of the Fireside, when Mattatall said he "noticed a couple of guys." As they pulled into the 529 Club parking lot, they were approached by four men, one of whom carried a bumper jack. Mattatall explained that Scanlon began yelling at the men and attempted to provoke a confrontation. Mattatall testified: "I said, 'Come on, John. Let's get out of here.' I turned around. I took off."

Later, Scanlon reappeared at Mattatall's home, exclaiming, "They just jumped me * * * I think they followed me here." Consequently, Mattatall testified, he expected trouble at that point. According to Mattatall, Scanlon picked up the .357 magnum and aimed it toward the kitchen window. Subsequently, Scanlon stated that the gun was jammed and, according to Mattatall, Scanlon started "fiddling with it." A few seconds later, Mattatall heard a "loud shot," then a "boom" as Scanlon's body hit the floor. Mattatall exclaimed, "Oh shit." When Mattatall realized that Scanlon was dead, he explained, he became extremely frightened and was afraid to call the police because he believed he would be in trouble because he was an ex-convict and there were guns and a dead body in the house. He testified that although he was quite drunk, he managed to climb upstairs where he then pondered what he should do next. Mattatall explained that he had picked up the phone and placed it on the bed when he passed out in the face of drunkenness and indecision.

After the trial justice had instructed the jury on murder and manslaughter, the jury returned a verdict of guilty of second-degree murder. After the motion for a new trial was denied, the trial justice also denied Mattatall's posttrial motion to be administered a sodium pentothal (or "truth serum") test. Mattatall argued in that motion that he had actually pulled the trigger,

thereby killing John Scanlon, but that it had been a "complete and total accident." On September 7, 1988, the trial justice sentenced Mattatall to sixty years' imprisonment, ten of which were suspended. He was also sentenced to an additional twenty years under the habitual-offender statute.

On appeal Mattatall raises five issues that we shall address. Additional facts will be supplied as necessary.

## I

Mattatall argues that the evidence presented at trial was insufficient to support a conviction of second-degree murder and that, therefore, his motion for judgment of acquittal should have been granted. In a criminal case a challenge to the sufficiency of the evidence is properly made by a motion for judgment of acquittal pursuant to Rule 29 of the Superior Court Rules of Criminal Procedure. *State v. Henshaw*, 557 A.2d 1204, 1206 (R.I.1989). Mattatall filed a motion for judgment of acquittal at the close of the state's case and renewed the motion at the end of the trial. In both instances the trial justice denied the motion. Since Mattatall presented a defense after the denial of his motion for judgment of acquittal, we consider now only the denial of Mattatall's motion for judgment of acquittal at the close of all the evidence. *Id.* at 1207 (citing *State v. Roddy*, 401 A.2d 23, 32 (R.I.1979)).

■ This court has on several occasions set out the standard to be applied when reviewing the denial of a motion for judgment of acquittal. *See State v. Dordain*, 566 A.2d 942, 944–45 (R.I.1989); *State v. Wilshire*, 509 A.2d 444, 452 (R.I. 1986); *State v. Gazerro*, 420 A.2d 816, 827 (R.I.1980). The trial justice must determine whether the evidence presented by the state is capable of supporting proof of guilt beyond a reasonable doubt. *State v. Caruolo*, 524 A.2d 575, 581 (R.I.1987); *State v. Gordon*, 508 A.2d 1339, 1348 (R.I. 1986); *State v. Wheeler*, 496 A.2d 1382, 1389 (R.I.1985). To make this determination, the trial court, as well as this court on review, must view all the evidence in the light most favorable to the state, without weighing the evidence or assessing the credibility of witnesses. *Caruolo*, 524 A.2d at 581. Unless the evidence so viewed fails to establish defendant's guilt beyond a reasonable doubt, the motion for judgment of acquittal must be denied. *State v. Burke*, 522 A.2d 725, 734 (R.I. 1987).

■ Applying these principles to the case at bar, we believe that the trial justice properly denied Mattatall's motion for judgment of acquittal. Mattatall argues that the evidence presented at trial was insufficient to sustain a conviction of second-degree murder. He contends that the evidence failed to demonstrate beyond a reasonable doubt that he shot Scanlon with a specific intent to kill and with malice aforethought and premeditation. We believe defendant confuses the elements necessary to sustain a conviction of second-degree murder with the elements necessary for a first-degree murder conviction. General Laws 1956 (1981 Reenactment) § 11–23–1 provides in relevant part:

> "Murder.—The unlawful killing of a human being with malice aforethought is murder. Every murder perpetrated by poison, lying in wait, or any other kind of wilful, deliberate, malicious and premeditated killing * * * is murder in the first degree. Any other murder is murder in the second degree."

At the outset we agree with defendant that proof of malice is a required element of second-degree murder. In fact, it is well settled under Rhode Island law that malice aforethought, express or implied, is an element of both first-and second-degree murder. *State v. McGranahan*, 415 A.2d 1298, 1302 (R.I.1980); *State v. Fenik*, 45 R.I. 309, 314, 121 A. 218, 221 (1923). We do, however, reject Mattatall's contention that explicit intent to kill and premeditation must subjectively be proven to sustain a conviction of second-degree murder.

Our State Legislature addressed the crime of murder in 1915 when it separated the offense, murder, into degrees and provided various punishments for those degrees. *See* P.L.1915, ch. 1258, § 6. This

codification did not change the elements of the crime of murder from those that existed at common law. *State v. Pine*, 524 A.2d 1104, 1107 (R.I.1987); *State v. Hathaway*, 52 R.I. 492, 501-02, 161 A. 366, 369 (1932). Indeed, at common law,

"although the intent to kill, without more, may support a prosecution for common law murder, such a murder ordinarily constitutes murder in the first degree only if the intent to kill is accompanied by premeditation and deliberation."

"The act of killing, of itself, is not sufficient to give rise to a presumption that it was premeditated and deliberate. Indeed, although a homicide without additional evidence is presumed to be murder, the presumption ordinarily rises no higher than murder in the second degree." 2 Warton's *Criminal Law*, § 140 at 182, 184-85 (Torcia 14th ed.1979).

■ We have no doubt that the malice necessary to sustain a conviction of *second-degree* murder may be inferred, from among other things, momentary premeditation and intent to kill. If there is a formation of an intent to kill, however brief, it can satisfy the necessary element to establish malicious intent. However, premeditation and intent to kill are not the exclusive grounds for a finding of the malice necessary to sustain a conviction of *second-degree* murder. This court has held, Legal malice can arise from either an express intent to kill or to inflict great bodily harm, *or* from wanton recklessness. *State v. Iovino*, 524 A.2d 556 (R.I.1987); *McGranahan*, 415 A.2d at 1302 (citing *Commonwealth v. Coleman*, 455 Pa. 508, 318 A.2d 716 (1974)). Malice may consist of an unjustified disregard for the possibility of death or great bodily harm and an extreme indifference to the sanctity of human life. *McGranahan*, 415 A.2d at 1302 (citing *State v. Wilkerson*, 295 N.C. 559, 247 S.E.2d 905 (1978); *Commonwealth v. Lawrence*, 428 Pa. 188, 236 A.2d 768 (1968)). Therefore, the evidence presented at trial need only demonstrate a recklessness of consequence or an extreme indifference to the sanctity of human life as a basis to sustain Mattatall's conviction of second-degree murder.

■ When we view all the evidence in this record in the light most favorable to the state, without weighing the evidence or assessing the credibility of witnesses, we conclude that the evidence establishes conduct that imports a deliberate and intentional killing of a human being. This is classic malice aforethought. Nevertheless, Mattatall contends that there is nothing about the nature of the killing that would support an inference that he shot Scanlon with malice aforethought because evidence of a single gunshot wound to the face is incapable of supporting such an inference beyond a reasonable doubt. The mere statement of this proposition illustrates its complete lack of merit. From the fact of the use of a deadly weapon, a reasonable inference may be drawn, directly and without speculation, that defendant formed an intent to kill the victim. This type of circumstantial evidence not only would support such an inference but would also almost compel the drawing of the inference.

We agree with the Supreme Court of North Carolina where it held:

"In order to prove the commission of murder in the second degree, the state must prove beyond a reasonable doubt only that the defendant unlawfully killed the deceased with malice. * * * Premeditation and deliberation are not elements of murder in the second degree. * * * [T]he fact that the defendant here used a gun was sufficient to prove malice, the other essential element of murder in the second degree." *State v. Melton*, 307 N.C. 370, 375, 298 S.E.2d 673, 677 (1983).

■ It is clear that under Rhode Island law, the state may rest its case entirely upon circumstantial evidence, "without disproving every possible speculation or inference of innocence as long as the totality of the circumstantial evidence offered constitutes proof of guilt beyond a reasonable doubt." *Caruolo*, 524 A.2d at 581. When determining whether the evidence is sufficient to sustain a conviction, no distinction is to be drawn between circumstantial and direct evidence. The only standard to guide the trial justice, and this

court on review, is whether the evidence constitutes proof of guilt beyond a reasonable doubt. *Id.* (citing *State v. Collazo,* 446 A.2d 1006, 1011 n. 4 (R.I.1982)). This court has previously held:

"[I]t is possible for the state to prove guilt by a process of logical deduction, reasoning from an established circumstantial fact through a series of inferences to the ultimate conclusion of guilt. The pyramiding of inferences during this process of deduction becomes speculative, however, and thus insufficient to prove guilt beyond a reasonable doubt when the initial inference in the pyramid rests upon an ambiguous fact that is equally capable of supporting other reasonable inferences clearly inconsistent with guilt." *Caruolo,* 524 A.2d at 581–82 (citing *State v. Alexander,* 471 A.2d 216, 218 (R.I.1984); *In re Derek,* 448 A.2d 765, 768 (R.I.1982)).

In the case at bar, the established circumstantial fact is that John Scanlon was found in Mattatall's home, shot in the head by a .357 magnum. This certainly is not an ambiguous fact that is capable of supporting other reasonable inferences clearly inconsistent with guilt. The testimony and exhibits at trial revealed that the gun was fired at a distance of eight to twelve inches and at an angle perpendicular to Scanlon's face. Expert testimony demonstrated conclusively that the death was not suicide. Neither was the evidence consistent with an accidental firing. The fact that the gun was fired at such close range at an angle perpendicular to the entry wound gave Dr. Mednick and the trial justice reason to conclude beyond a reasonable doubt that the shooting was not an accident—but was, in fact, a homicide. Furthermore, there was testimony regarding the prominent safety features of the .357 magnum that would prevent an accidental discharge. This evidence lends itself to a clear inference that someone other than John Scanlon pulled the trigger of the .357 magnum. We consider, as did the trial justice, the fact that defendant was alone in his home with Scanlon's body and that under Scanlon's body was a .22–caliber handgun, the only firearm visible to the police that morning. It

appeared to the police officers and James King that Mattatall was overwhelmingly nonchalant and not the least bit bothered at the finding of a dead man in his house even though the dead man was allegedly Mattatall's friend. Mattatall then told police, "I shouldn't have shown him that gun last night," the only clear inference being that Scanlon shot himself either accidentally or purposefully. However, it was then proven conclusively that the gun found under Scanlon's body was not the gun that fired the fatal bullet. The murder weapon, a .357 magnum, was found concealed in shrubbery almost 200 feet from Mattatall's house in close proximity to the place where police also discovered a sock containing live .357 ammunition. Mattatall's dog, Tippy, never barked that night when King heard someone walk through the yard, one could assume, to dispose of the gun. We agree with the trial justice that a dog does not bark at those whom it knows—especially a "good watch dog" like Tippy. Clearly somebody, the inference being Mattatall, deliberately discarded the weapon and ammunition, hoping, of course, that this evidence would not be found.

We believe that by a process of deliberation, the evidence lends itself to a clear inference—not speculation—that Mattatall shot Scanlon and did so with malice aforethought. In totality, the evidence depicts a fairly wild night fraught with guns and alcohol. The evidence supports a legitimate inference that sometime during that night Mattatall held a loaded .357 magnum, a howitzer among handguns, aimed point blank at John Scanlon's face when the gun discharged. It is this conduct that constitutes a recklessness of consequence, capable of supporting an inference of malice aforethought. We have previously expressed our belief that "[m]alice may be inferred from the attending circumstances surrounding a defendant's conduct." *McGranahan,* 415 A.2d at 1302 (citing *Commonwealth v. Steele,* 448 Pa. 518, 295 A.2d 334 (1972)). We draw from this principle the holding that malice may be inferred from the very nature of the killing itself. *See People v. Anderson,* 70 Cal.2d

15, 447 P.2d 942, 73 Cal.Rptr. 550 (1968); *State v. Blair*, 347 N.W.2d 416 (Iowa 1984). A .357 magnum in the face, at eight inches away, evidences an extreme indifference to human life. Thus, the nature of the killing alone demonstrates recklessness of consequence and a wanton disregard for the sanctity of human life, capable of supporting a finding of the malice aforethought necessary to sustain a conviction of second-degree murder.

Moreover, we believe that the evidence also supports a finding of intent to kill. Expert testimony established that at least three to four pounds of pressure need to be applied to the trigger of the .357 magnum before it will discharge in the single-action mode and up to seven pounds in the double-action mode. This evidence makes it clear that the .357 magnum is not a hair-trigger pistol. In light of the testimony regarding the safety features in the weapon itself, ruling out the possibility of accidental discharge, we find it is clear that the person who fired the gun *must* have exerted pressure on the trigger in order for the gun to discharge. We believe that these facts alone give rise to the inference that there was a conscious, deliberate effort to pull the trigger and, therefore, that a jury could have inferred intent to kill. Furthermore, we agree with the trial justice that the firing of a weapon at such close range, the switching of firearms, the placement of the .22 under Scanlon's body, the concealment of the .357 and ammunition in the woods, the attempt to create the false impression that Scanlon had committed suicide, and Mattatall's failure to call for help or to report the shooting, all of which constituted purposeful and deliberate conduct in an attempt to conceal the true facts, give rise to a strong inference of an intent to kill. These inferences, although potentially sufficient to support a conviction of first-degree murder, are, at the very least, capable of demonstrating defendant's malice aforethought necessary to sustain a conviction of second-degree murder. Accordingly, the trial justice was correct in denying defendant's motion for judgment of acquittal.

 We next address whether the trial justice improperly denied Mattatall's motion for a new trial. When confronted with a motion for a new trial, the trial justice, while exercising independent judgment and considering all material evidence in light of the charge given to the jury, must appraise the weight of the evidence and assess the credibility of witnesses. He may accept or reject conflicting testimony and draw all reasonable inferences therefrom. *Beauchemin v. Sweeten*, 471 A.2d 624, 626 (R.I.1984). If in this independent assessment the trial justice determines that the evidence presented at trial is sufficient for the jury, as factfinders, to conclude that it proves guilt beyond a reasonable doubt, the motion for a new trial must be denied. *McGranahan*, 415 A.2d at 1302 (citing *State v. Barnes*, 122 R.I. 451, 409 A.2d 988 (1979)). Even if the evidence and reasonable inferences drawn therefrom are so nearly balanced or are such that reasonable minds could arrive at different results, the trial justice must deny the motion for a new trial. *Connors v. Gasbarro*, 448 A.2d 756, 759 (R.I.1982).

 If the trial justice has sufficiently articulated the rationale for whatever decision he or she has rendered, then such ruling is entitled to great weight and will not be disturbed by this court unless the trial justice overlooked or misconceived material evidence or was otherwise clearly wrong. *State v. Tarvis*, 465 A.2d 164, 174 (R.I.1983).

 We believe that the trial justice, after weighing the evidence and assessing the credibility of witnesses, properly denied Mattatall's motion for a new trial. The trial justice determined that Mattatall "did everything that he could do that would point to innocence" when, in fact, his acts were "acts of a guilty man." The trial justice remained "absolutely convinced" that the shooting was not an accident. He elaborated:

"If you look at the actions of the Defendant, such as * * * sitting on the edge of his bed: What should I do? Who should I call? I won't call anybody. I'll take the phone off the hook, switch fire-

arms. These are not the acts of someone who was so drunk that he had no conscious thought as to what he was doing. This man is not so drunk that somehow the gun accidentally discharged. This was not a minimal manslaughter case. This was, in fact, murder in the second-degree, and the evidence bears it out."

After independently assessing the credibility of the witnesses, the trial justice determined that Mattatall's testimony at trial was "inherently incredible," "inconsistent," "implausible," and definitely not "believable." Nevertheless, the trial justice concluded that the evidence, even without Mattatall's testimony, was sufficient to support the jury's verdict of second-degree murder.

▆▆▆ In relying upon these facts as a basis for denying the motion for a new trial, we believe that the trial justice did not overlook or misconceive material evidence and certainly was not clearly wrong. *State v. Cacchiotti*, 568 A.2d 1026, 1030 (R.I.1990). We agree with the trial justice that when a defendant elects to testify, he runs the very real risk that if disbelieved, the trier of fact may conclude that the opposite of his testimony is the truth. *United States v. Kenny*, 645 F.2d 1323, 1346 (9th Cir.1981). As long as there exists some other evidence of the defendant's guilt, disbelief of a defendant's sworn testimony is sufficient to sustain a finding of guilt. *United States v. Tyler*, 758 F.2d 66, 69 (2d Cir.1985); *United States v. Hood*, 493 F.2d 677, 681 (9th Cir.1974). As was stated by the United States Court of Appeals for the Ninth Circuit: "A trier of fact is not compelled to accept and believe the self serving stories of vitally interested defendants. Their evidence may not only be disbelieved, but from the totality of the circumstances, including the manner in which they testify, a contrary conclusion may be properly drawn." *United States v. Cisneros*, 448 F.2d 298, 305 (9th Cir.1971).

In the case at bar not only is Mattatall a vitally interested defendant but his testimony is replete with inconsistencies. Furthermore, we believe there exists the required supplemental evidence that the United States Court of Appeals held was necessary to "help make the evidence in a borderline case sufficient." *Tyler*, 758 F.2d at 70. Independent evidence in this case established that Mattatall was in his house when the fatal shot was fired, that the gun found under Scanlon's body was not the fatal weapon, that the fatal weapon and its ammunition had been concealed probably by Mattatall, that Mattatall attempted to mislead police and thwart an investigation, and that Mattatall failed to call for help or report the shooting. The state independently established all this evidence even *before* Mattatall testified. The trial justice concluded that this evidence alone was sufficient to support the jury's verdict of second-degree murder. Nevertheless, when the independent evidence is considered in light of Mattatall's patently incredible testimony—testimony full of inconsistencies and contradictions—neither the trial justice nor any rational juror could have entertained any reasonable doubt about Mattatall's guilt.

Consequently we are satisfied that the evidence and testimony were sufficient to support a jury finding that defendant possessed the legal malice necessary to sustain his conviction of second-degree murder. The trial justice was able to point to the ample evidence in approving the jury's verdict and in denying defendant's motion for a new trial. Accordingly, we find no error in his decision.

II

We next consider whether the trial justice committed error when he permitted the state to impeach Mattatall's testimony, on cross-examination, with statements obtained in violation of Mattatall's Fourth and Sixth Amendment rights. The admissibility of these statements was the subject of our opinions in *State v. Mattatall*, 510 A.2d 947 (R.I.1986), and *State v. Mattatall*, 525 A.2d 49 (R.I.1987). The facts of the case as they relate to this issue are as follows.

▆▆▆ After preliminary questions, the police transported Mattatall from his home to the Warwick police station for further

questioning. In the interrogation room, Mattatall suggested that Scanlon had committed suicide. Mattatall denied ownership of the .22–caliber handgun but admitted that he did own a .357 magnum pistol. Later that same day, Mattatall admitted that he owned both the .22–caliber and the .357 magnum. He refused to disclose the location of the .357 magnum but signed a consent form allowing police to search his home for the gun. At this point Mattatall stated that on the night in question he was showing Scanlon how to operate the .22–caliber handgun when it accidentally discharged and struck Scanlon in the face. Admission of these statements at his first trial warranted reversal by this court because the statements had been obtained in violation of Mattatall's Fourth Amendment rights.[1] *State v. Mattatall,* 510 A.2d at 950–52.

On December 26, 1982, at which time Mattatall had been charged with the murder of Scanlon,[2] one John Carney notified Warwick police that Mattatall had been making threatening telephone calls. At Carney's invitation, the police listened in on three phone conversations between Mattatall and Carney. It was the second conversation on December 27 that Carney, knowing that police were listening, elicited information that no one other than Mattatall and Scanlon were present in the house the night Scanlon died. Carney then posed the question, "You mean Scanlon shot himself?" and Mattatall responded in the negative.[3]

Asked on remand to consider, in light of *Kuhlmann v. Wilson,* 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986), our holding that the use of these statements constituted a violation of Mattatall's Sixth Amendment right to counsel, we answered affirmatively and reaffirmed our original vacation of the conviction. *State v. Mattatall,* 525 A.2d at 51–53.[4]

1. Although defendant did not testify at his first trial, the oral statements in issue were admitted in the state's case in chief. This court determined that Mattatall had been "seized for Fourth Amendment purposes and was detained for a substantial period of time during which he was interrogated." *State v. Mattatall,* 510 A.2d 947, 951 (R.I.1986). We held that the oral statements were fruits of an illegal search and seizure in violation of the Fourth Amendment to the Constitution of the United States, and therefore, were inadmissible as evidence in the state's case in chief. *Id.* at 952–53.

2. At the time Mattatall made the threatening phone calls, he had not yet been indicted for the murder of Scanlon. We determined, nevertheless, that it was of no consequence that Mattatall had not yet been indicted since his Sixth Amendment right to counsel applied as soon as adversarial judicial proceedings had commenced. *State v. Mattatall,* 510 A.2d at 953 (citing *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977)). "There is no question that the Sixth Amendment right to counsel was applicable in this case, that counsel had entered an appearance in the case, that the police knew or were chargeable with knowledge of this set of facts, and that they knowingly listened to conversations in which defendant made incriminating statements concerning pending charges." *Mattatall,* 510 A.2d at 953.

3. The following dialogue ensued during the state's cross-examination of Mattatall:

"Q. Having Mr. Carney say to you, 'You mean Scanlon shot himself?' And you responded, 'No.' Do you remember saying that? Do you remember that being part of your conversation with Mr. Carney?

"A. What did Mr. Scanlon, Mr. Carney say to me?

"Q. 'You mean Scanlon shot himself,' as a question, and your response being, 'No,' and then a pause, and 'They are here. I have got to go.'

"A. I remember saying no, it was an accident.

"Q. Do you remember telling, at some point, you told Mr. Carney it was an accident. You had several conversations with him, right?

"A. Yes. Well, yes, two or three.

"Q. You specifically remember one time him asking you, 'You mean Scanlon shot himself?' And, your response being, 'No.' Do you remember that, sir?

"A. I just told you what I remembered.

"Q. Do I take that as no, you don't specifically remember that part of the conversation?

"A. I remember saying no, it was an accident."

4. In *State v. Mattatall,* 525 A.2d 49, 52–53 (R.I. 1987), this court held: "[T]he analysis of *Kuhlmann,* when applied to the facts of the case at bar, leads us to the conclusion that the role of the informant here was not one of mere passive listener * * *. Admission of such statements, whether through the police or Carney himself, would constitute a violation of defendant's Sixth Amendment right to counsel."

On appeal Mattatall contends that the state should not have been permitted to use these statements to impeach him on cross-examination. In support of this contention, he argues that evidence obtained in violation of his constitutional right to counsel and statements obtained by police following an unlawful arrest were inadmissible for all purposes.

■■■ We first address whether Mattatall's illegally obtained statements to Warwick police officers were inadmissible on the state's cross-examination of Mattatall. It is well established under Rhode Island law that a witness's testimony may be impeached by prior inconsistent statements upon the state's establishing a proper foundation for the admission of the impeaching evidence. *State v. Robbio,* 526 A.2d 509, 513 (R.I.1987) (citing *State v. Cianci,* 430 A.2d 756, 762 (R.I.1981)). A defendant who testifies on his own behalf is a witness and is subject, therefore, "to a searching cross-examination to rebut not only the facts stated but also the inferences and conclusions that might be drawn from such testimony." *State v. Dowell,* 512 A.2d 121, 124 (R.I.1986) (citing *State v. Soto,* 477 A.2d 945, 949 (R.I.1984)). This is especially true when the credibility of a defendant who testifies at trial is crucial. *Dowell,* 512 A.2d at 124. Accordingly a trial justice may grant to the prosecution on cross-examination for impeachment purposes latitude to introduce material that would not be admissible as part of the state's case in chief. "Even illegally obtained evidence may be admitted for impeachment purposes when a defendant gives testimony that may be construed as absolving himself from fault in a criminal case." *Id.*

The United States Supreme Court addressed the same issue in *Walder v. United States,* 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954), and held that the government was entitled to impeach the credibility of a defendant on cross-examination with evidence obtained in violation of a defendant's Fourth Amendment rights provided, however, that the illegally obtained evidence directly contradicted the defendant's assertions on direct examination.

The Fifth Amendment analogue to *Walder* is *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), in which the Supreme Court held that statements, inadmissible against a defendant in the prosecution's case in chief because of a lack of the procedural safeguards required by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), may, if their trustworthiness satisfies legal standards, be used for impeachment purposes to attack the credibility of a defendant's direct testimony at trial. *Harris v. New York,* 401 U.S. at 224–26, 91 S.Ct. at 645–46, 28 L.Ed.2d at 3–5. *See also Oregon v. Hass,* 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975). Recognizing that the deterrence of improper police tactics in the unlawful seizure of evidence must be balanced against a defendant's ability to resort to perjurious testimony in reliance on the state's inability to challenge his credibility, the Court reasoned:

"It is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths. Such an extension of the *Weeks* doctrine [*Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914)] would be a perversion of the Fourth Amendment." *Id.* 401 U.S. at 224, 91 S.Ct. at 645, 28 L.Ed.2d at 4 (quoting *Walder v. United States,* 347 U.S. 62, 65, 74 S.Ct. 354, 356, 98 L. Ed. 503, 507 (1954)).

In *United States v. Havens,* 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980), the United States Supreme Court expanded *Harris* by permitting the prosecution to impeach a defendant's statements made in response to proper cross-examination, with evidence obtained in violation of the Fifth Amendment rights safeguarded by *Miranda.* In the Court's view, the ends of the exclusionary rules espoused in *Walder* and *Harris* were adequately implemented

by denying the government's use of illegally obtained evidence as substantive evidence of guilt in the state's case in chief. Expanding the breadth of this policy by forbidding impeachment of a defendant's false testimony first given on cross-examination would only incrementally further the ends of the exclusionary rules and permit false testimony to go unchallenged, "with the resulting impairment of the integrity of the factfinding goals of the criminal trial." *Havens*, 446 U.S. at 627, 100 S.Ct. at 1917, 64 L.Ed.2d at 566. No distinction, therefore, should be drawn between a defendant's testimony on direct examination and his answers to proper questions on cross-examination:

> "In terms of impeaching a defendant's seemingly false statements with his prior inconsistent utterances or with other reliable evidence available to the government, we see no difference of constitutional magnitude between the defendant's statements on direct examination and his answers to questions put to him on crossexamination *that are plainly within the scope of the defendant's direct examination.*" (Emphasis added.) *Id.*

Applying these principles to the case at bar, we find no evidence that would warrant a finding that the prosecution manufactured an issue in the course of cross-examination for the purpose of impeaching Mattatall's credibility with evidence that would otherwise be inadmissible. *State v. O'Dell,* 576 A.2d 425, 429 (R.I.1990). To the contrary, the prosecution's questions to Mattatall on cross-examination were plainly within the scope of Mattatall's direct examination and, therefore, were relevant and admissible in promoting the truth-seeking function of the trial. *Havens,* 446 U.S. at 627, 100 S.Ct. at 1916–17, 64 L.Ed.2d at 566.

Moreover, we recognize, as the United States Supreme Court did in *Harris,* that the proper functioning of the adversary system requires that the government be permitted proper and effective cross-examination in an attempt to elicit the truth. In the case at bar, Mattatall's obligation to testify truthfully was binding on him whether he testified on direct or on cross-examination. The record clearly reveals that Mattatall testified to proclaim his innocence by asserting that Scanlon shot himself accidentally. Consequently the state had a right by cross-examination to rebut Mattatall's self-serving statements and diminish the likelihood that the jury would draw such an inference. *State v. Soares,* 556 A.2d 1002, 1005, (R.I.1989) (citing *State v. Dowell,* 512 A.2d 121, 124 (R.I.1986)). It was the state's prerogative, therefore, to use Mattatall's statements—even though they were obtained in violation of his Fourth Amendment rights—as a means to impeach his credibility.

We acknowledge that this court possesses the power to establish a higher standard of protection for a criminal defendant than that which he might otherwise be afforded under the Fourth Amendment to the United States Constitution. Article 1, section 6, of the Rhode Island Constitution would provide the vehicle by which this court could guarantee a criminal defendant greater rights than the United States Constitution. Relying on the Rhode Island Constitution, therefore, we could have opted to suppress the admission of Mattatall's statements for impeachment purposes. As we recognized in *State v. von Bulow,* 475 A.2d 995 (R.I.1984):

> "[C]itizens of Rhode Island possess 'a double barrelled source of protection which safeguards their privacy from unauthorized and unwarranted intrusions: the fourth amendment of the Federal Constitution and the Declaration of Rights which is specified in the Rhode Island Constitution.' *State v. Sitko,* R.I. 460 A.2d 1, 2 (1983) (quoting *State v. Luther,* 116 R.I. 28, 29, 351 A.2d 594–95 (1976)). This dual safeguard flows directly from the United States Supreme Court's explicit acknowledgement of the 'right of state courts, as final interpreters of state law, "to impose higher standards on searches and seizures than [those] required by the Federal Constitution," even if the state constitutional provision is similar to the Fourth Amendment.' *State v. Benoit,* R.I. 417 A.2d

895, 899 (1980) (quoting *Cooper v. California*, 386 U.S. 58, 62, 87 S.Ct. 788, 791, 17 L.Ed.2d 730, 734 (1967))." 475 A.2d at 1019.

This double barreled protection is supplemented by Rhode Island's statutory-exclusionary rule under G.L.1956 (1985 Reenactment) § 9–19–25, which provides:

> "In the trial of any action in any court of this state, no evidence shall be admissible where the same shall have been procured by, through or in consequence of any illegal search and seizure *as prohibited in section 6 of article 1 of the constitution of the state of Rhode Island.*" (Emphasis added.)

This statute reflects the Legislature's "clear intention to provide independent vitality to art. I, sec. 6," in guarding Rhode Island citizens against unwarranted searches and seizures. *von Bulow*, 475 A.2d at 1020. We recognize, however, that § 9–19–25, in effect, does nothing more than implement the language of article 1, section 6, of the Rhode Island Constitution. Significantly, because the language in article 1, section 6, is identical to that of the Fourth Amendment, we are not required to afford—and indeed we refuse to grant—Mattatall greater rights than those he is afforded under the Fourth Amendment.

This statute, § 9–19–25, was adopted by the Legislature in reaction to this court's holding in *State v. Olynik*, 83 R.I. 31, 113 A.2d 123 (1955), and the holding of the United States Supreme Court in *Wolf v. Colorado*, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949). Those cases were decided at a time when the exclusionary rule, later adopted in *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) was not applicable to the states. From the time of the enunciation of the exclusionary rule in *Mapp* this court has, with very few exceptions, followed the opinions of the United States Supreme Court whether premised on the Fourth Amendment to the United States Constitution or on our own statutory exclusionary rule. The Rhode Island exclusionary rule is a statute that has never acquired or developed an independent body of jurisprudence. Although

defendant urges us to embark upon such a course, in this instance we decline to do so.

■ We next address whether Mattatall's statements to Carney were inadmissible for impeachment purposes. Mattatall contends that evidence obtained in violation of his Sixth Amendment right to counsel should be treated differently from a Fourth Amendment violation so as to preclude completely any use of the illegally obtained evidence. The distinction he argues is that whereas transgressions of *Miranda* and *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) are procedural in nature, postarraignment violations occur after the adversarial process has commenced and thus implicate the substantive constitutional guarantees of the Sixth Amendment itself.

■ It is clear that once a defendant invokes the Sixth Amendment right to counsel, any waiver of that right—even if voluntary, knowing, and intelligent under traditional standards—is presumed invalid if secured pursuant to police-initiated interrogation. Consequently any statement made in this context by a defendant is inadmissible in the state's case in chief as evidence of guilt. *Michigan v. Jackson*, 475 U.S. 625, 636, 106 S.Ct. 1404, 1411, 89 L.Ed.2d 631, 642 (1986).

The United States Supreme Court, in considering the government's prerogative to impeach a defendant with evidence obtained in violation of the defendant's Sixth Amendment right to counsel, held that such evidence may be used to impeach a defendant's false or inconsistent testimony even though the same evidence was not admissible as evidence of guilt in the state's case in chief. The Court reasoned:

> "Both *Jackson* and *Edwards* establish prophylactic rules that render some otherwise valid waivers of constitutional rights invalid when they result from police-initiated interrogation, and in neither case should 'the shield provided by [the prophylactic rule] be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances.' *Michigan v. Harvey*, 494 U.S. 344, 353, 110

S.Ct. 1176, 1182, 108 L.Ed.2d 293, 304 (1990) (quoting *Harris,* 401 U.S. at 226, 91 S.Ct. at 646, 28 L.Ed.2d at 5).

Thus *Harvey* finalized a line of cases expanding the state's ability on cross-examination to impeach a defendant with unlawfully obtained evidence. This expansion did not, however, diminish the state's burden to demonstrate initially that the defendant made a knowing and voluntary waiver of his right to counsel when the statements were obtained by police. *Harvey,* 494 U.S. at 353, 110 S.Ct. at 1182, 108 L.Ed.2d at 305 (citing *Brewer v. Williams,* 430 U.S. 387, 404, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424, 439 (1977)). "[I]f all the circumstances in a particular case show that the police have engaged in a course of conduct which would render the waiver involuntary, the burden will not be satisfied." *Harvey,* 494 U.S. at 354, 110 S.Ct. at 1182, 108 L.Ed.2d at 305.

In the case at bar Mattatall was apparently unaware that the police knowingly listened to conversations in which he made incriminating responses concerning pending charges. Absent his knowledge that the police were participating in what the Supreme Court characterized as "surreptitious interrogation," Mattatall cannot be held knowingly and voluntarily to have waived his right to counsel. *United States v. Henry,* 447 U.S. 264, 273, 100 S.Ct. 2183, 2188, 65 L.Ed.2d 115, 124 (1980). Consequently, by concealing their presence while Carney actively elicited the incriminating responses, the police denied Mattatall the opportunity to consult with counsel and thus denied him the assistance of counsel guaranteed by the Sixth Amendment. Under an established line of precedents including *Henry, supra; Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), and *Maine v. Moulton,* 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985), such statements are inadmissible in the state's case in chief as evidence of guilt. Indeed, this was precisely the holding we ultimately reached in *State v. Mattatall,* 525 A.2d 49 (R.I.1987). Mattatall contends, nevertheless, that in the absence of a valid waiver, the evidentiary exclusion should extend to prohibit the state's use of these statements for impeachment purposes.

At the outset we recognize that the Sixth Amendment violation in the instant case differs in kind from those violations that were the subject of the Court's holding in *Harvey. Edwards, Jackson,* and *Harvey* involved "prophylactic" rules that rendered otherwise valid waivers of constitutional rights invalid when they resulted from police-initiated interrogation. Although evidence obtained in this context is inadmissible in the state's case in chief, such evidence may be used to impeach the credibility of a defendant who elects to testify. Contrary to Mattatall's assertion, however, constitutional violations that are beyond the prophylactic rules do not necessarily warrant the exclusion of such evidence for all purposes. The exclusion of reliable and probative evidence for *all* purposes is not mandated unless it is derived from coerced or involuntary statements. *Harvey,* 494 U.S. at 351, 110 S.Ct. at 1181, 108 L.Ed.2d at 303 (citing *New Jersey v. Portash,* 440 U.S. 450, 459, 99 S.Ct. 1292, 1297, 59 L.Ed.2d 501, 510 (1979)). There is nothing in the facts of this case to suggest that Mattatall's statements to John Carney were involuntary or coerced. Mattatall was not being interrogated in a police station, nor was he surrounded by numerous police officers or questioned in relays. On his own initiative Mattatall called and threatened Carney not once—but at least four times. Certainly this activity does not demonstrate an involuntary, or coerced, verbal statement that was the subject of the Court's holding in *Portash.* It is important to note that in both *New Jersey v. Portash* and *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), the Court declined to allow for any purpose the use of statements that were coerced in the fundamental sense. No such coercion or compulsion is present in the case at bar.

▮ Whether a defendant's statements are obtained in violation of the Fourth, Fifth, or Sixth Amendment is not, in our view, a significant distinction in terms of the admissibility of those statements for

impeachment purposes. The essence of a criminal trial is its search for the truth. In no way should the exclusionary rules enunciated by the Supreme Court in either *Weeks, Miranda, Jackson, Massiah, Henry,* or *Moulton* be perverted by any defendant into a license to commit perjury. The defendant's obligation to speak truthfully during the trial is absolute and is not lessened in response to violations of the defendant's constitutional rights. Such voluntary statements, although inadmissible in the state's case in chief, are properly accessible to the state for impeachment of a defendant's false or inconsistent testimony. Prior opinions of the Supreme Court, on the issue of impeachment, would indicate that the use of this evidence is not constitutionally prohibited. In *Michigan v. Harvey,* for example, the Supreme Court said, "If a defendant exercises his right to testify on his own behalf, he assumes a reciprocal 'obligation to speak truthfully and accurately,' *Harris, supra,* 401 U.S. at 225, 91 S.Ct. at 645, and we have consistently rejected arguments that would allow a defendant to 'turn the illegal method by which evidence in the government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths.' *Id.* at 224, 91 S.Ct. at 645 (quoting *Walder v. United States,* 347 U.S. 62, 65, 74 S.Ct. 354, 356, 98 L.Ed. 503 (1954)). *See also Hass, supra,* 420 U.S., at 722, 95 S.Ct. at 1220–21; *United States v. Havens,* 446 U.S. 620, 626, 100 S.Ct. 1912, 1916, 64 L.Ed.2d 559 (1980)." 494 U.S. at 351, 110 S.Ct. at 1180, 108 L.Ed.2d at 302–03.

Consequently the total exclusion of this evidence was neither appropriate nor constitutionally required. The exclusion of Mattatall's statements from the state's case in chief (*State v. Mattatall,* 525 A.2d 49 (R.I.1987)) sufficiently served to vindicate Mattatall's Sixth Amendment rights. No legal basis, in our view, existed for the exclusion of the statements for impeachment of defendant's credibility. Accordingly we find no error in the trial court's evidentiary ruling.

## III

▮ Next, Mattatall contends that the trial justice committed reversible error by permitting the medical examiner, Dr. Mednick, to offer his opinion that Scanlon's death was a homicide. In support of this contention Mattatall argues that Dr. Mednick's opinion regarding the manner of death was not within the realm of his medical capabilities or expertise because it was based on the distance between the gun and the body at the time of the shooting.

In overruling Mattatall's objection to the prosecutor's question concerning the manner of death, the trial justice concluded, "If he's got an opinion, I think he's allowed to offer it, if he's got a basis for it." The basis for Dr. Mednick's opinion lies within the domain of the Rhode Island General Laws, vesting the State Medical Examiner with the authority "to make postmortem examinations, to undertake inquests, and to perform autopsies" where there exists "a reasonable belief that the manner of death could be pronounced a * * * [d]eath by a homicide, suicide, or casualty." G.L.1956 (1989 Reenactment) § 23–4–4. Section 23–4–8 additionally provides:

"Procedure for investigation of deaths.— (a) When the office of state medical examiners has notice that there has been found, or is lying within this state, the body of a person who is supposed to have come to his or her death by violence an agent of the office * * * shall forthwith repair to the place where the body lies and *take charge of it, view it and make personal inquiry into the cause and manner of death.*" (Emphasis added.)

As the assistant medical examiner, therefore, Dr. Mednick had a statutory obligation to view Scanlon's body and to make a personal inquiry into the cause and manner of death. *State v. Washington,* 581 A.2d 1031, 1033 (R.I.1990). This is exactly what Dr. Mednick did when he conducted his own independent investigation. Doctor Mednick entered the scene of the crime and viewed Scanlon's lifeless body lying on the kitchen floor with a significant amount of blood located about the head and arm area. A .22–caliber handgun lay visible beneath

the body. A close external examination revealed a defect in Scanlon's left cheek representing a gunshot wound entrance. An internal investigation of Scanlon's body revealed the horizontal path of the fatal bullet. This finding, coupled with the near symmetry of the injury pattern surrounding the wound, gave Dr. Mednick reason to conclude that the gun was fired at an angle perpendicular to Scanlon's face. These findings were clearly within the expertise of Dr. Mednick, who was qualified at trial without objection in the field of medical examination and forensic pathology. It was Dr. Mednick's opinion at trial that Scanlon's death was caused by a gunshot wound to the head. When asked to give an opinion about the manner of death, Dr. Mednick testified, "Based on the examination of the gunshot wound, the pattern of the wound, the position of the body at the scene, which I was there to see, I feel that the most probable manner of death is homicide."

Although Dr. Mednick expressed an opinion that the gun was fired at a distance of "one to two feet" from Scanlon's face, he unequivocally stated that the ballistic report, documenting that the gun had been fired at a distance of eight to twelve inches, would not have changed his opinion that the death was a homicide. Contrary to Mattatall's assertion, there was a strong, independent foundation upon which Dr. Mednick based his ultimate conclusion that the death was a homicide. Doctor Mednick elaborated:

"The pattern of the gunshot entry wound being perpendicular to the skin, the fact that this is not the size of the injury on the face diameter, the fact that the scene visit that I had made, and the autopsy, could not, in any way, be construed as suicide. Again, the fact that the perpendicular gunshot entry wound had no indications of any angulation whatsoever, but was pointed directly at the face, * * * does not represent an accidental firing of the gun.

The position of the body, the finding of the .22 caliber revolver under his knee, the absence of a suicide note, the absence of any indication of any suicidal tendency

of the deceased. * * * It was not just the .22, but certainly if a person committed suicide, I think that would be the weapon used—the one next to him. That is my experience in the past six, seven years. I have not seen a suicide use another weapon other than the one that caused the injury. * * * All of these ruled out * * * in my mind, the possibility of suicide.

[T]he entire scene * * * most important again being the gunshot wound * * * perpendicular to the skin. * * * In almost all settings it is beyond a reasonable doubt that in a situation present where a gun is fired at a one foot distance, *or whatever figure* * * * testimony is beyond a reasonable doubt that it is—I would consider it—homicide." (Emphasis added.)

We believe that this testimony clearly established that Dr. Mednick's opinion was based not on conjecture but on substantiated reasoning and evidence that was completely within the realm of Dr. Mednick's medical capabilities, expertise, and statutory responsibility. The trial justice properly observed that admissibility of Dr. Mednick's opinion was a "different question" from what weight, if any, such opinion ought to be assigned, for that was the function of the jury. We agree with the trial justice that Dr. Mednick's opinion, "given his expertise ought to be admitted, and you [Mattatall] can cross-examine him on it, [b]ut it comes in for its weight." Based on a review of the testimony, the jury had every right to hear Dr. Mednick's opinions and assign them weight accordingly. Consequently the trial justice committed no error.

### IV

Mattatall next contends that the trial justice improperly denied his motion in limine to preclude the state's use of a prior conviction for impeachment purposes. At issue is a conviction in 1973 for assault with a dangerous weapon. Mattatall argues that pursuant to Rule 609 of the Rhode Island Rules of Evidence, this conviction was inadmissible owing to its re-

moteness and the resulting prejudicial effect to the defendant.

In Rhode Island the right to impeach the credibility of a witness with evidence of prior convictions is statutory. *State v. Maxie*, 554 A.2d 1028, 1031 (R.I.1989) (citing G.L.1956 (1985 Reenactment) § 9–17–15). In July of 1987 this court adopted the Rhode Island Rules of Evidence, which consequently casted § 9–17–15 "in a new light." *Maxie*, 554 A.2d at 1031. Prior to the adoption of these rules, the practice had been that a witness could be impeached by evidence of a prior conviction "regardless of the possible prejudice or of whether the conviction was for a crime involving dishonesty or false statement." *State v. Moretti*, 521 A.2d 1003, 1011 (R.I.1987). Under this practice, the sole basis for which a trial justice could prohibit the use of a prior conviction to impeach a witness's credibility was remoteness. *See, e.g., Maxie*, 554 A.2d at 1031; *State v. Lariviere*, 527 A.2d 648, 650 (R.I.1987); *State v. Aptt*, 441 A.2d 824, 828 (R.I.1982). These standards were modified by the adoption of the Rhode Island Rules of Evidence. Rule 609(b) of those Rules provides that evidence of a conviction is inadmissible to impeach a witness's credibility if the trial justice "determines that its prejudicial effect substantially outweighs the probative value of the conviction." Mattatall would have this court construe Rule 609 to mean that a conviction more than ten years old is *per se* remote and, therefore, is inadmissible because its probative value is substantially outweighed by the prejudicial effect to defendant. Mattatall misconceives the nature of Rule 609 as well as prior case law.

 Under Rhode Island law, remoteness of a prior conviction is not measured solely by the passage of time. *State v. Pope*, 414 A.2d 781, 784 (R.I.1980). The trial justice must balance the remoteness of the conviction, the nature of the crime, and the defendant's disdain for the law as represented by the extent of his prior criminal record, to determine whether the relevance with respect to credibility outweighs the prejudicial effect to the defendant. It has

long been recognized that there is a "basis in reason and experience why one may place more credence in the testimony of one who has lived within the rules of society and the discipline of the law than in that of one who has so demonstrated antisocial tendency as to be involved in and convicted of serious crime." *State v. Sands*, 76 N.J. 127, 143, 386 A.2d 378, 386 (1978) (quoting *State v. Harless*, 23 Utah 2d 128, 130, 459 P.2d 210, 211 (1969)). Thus, when a person has been convicted of a series of crimes through the years, conviction of the earliest crime, though committed many years before, as well as intervening convictions, should be admissible for impeachment purposes unless the trial justice determines that the prejudicial effect outweighs the probative value of the past conviction. *Sands*, 76 N.J. at 144–45, 386 A.2d at 387. Moreover, evidence of a felony conviction involving dishonesty or false statement should not be branded as any more or less acceptable for impeachment purposes than evidence of other felony crimes. *Moretti*, 521 A.2d at 1011. Whether a particular offense had a direct bearing on truth or veracity is merely another factor that the trial justice, in the exercise of discretion, may consider when determining whether the probative value of the conviction for impeachment purposes outweighs the prejudicial effect to the defendant.

These principles underlie the discretion given to the trial justice in Rule 609(b) of the Rhode Island Rules of Evidence, which additionally provides:

"If more than ten years [have] elapsed since the date of the conviction or the release of the witness from the confinement imposed for that conviction, whichever is the later date, or if the conviction is for a misdemeanor not involving dishonesty or false statement, the proponent of such evidence shall make an offer of proof out of the hearing of the jury so that the adverse party shall have a fair opportunity to contest the use of such evidence."

Thus the fact that Mattatall's prior conviction was slightly more than ten years old only ensured Mattatall a fair opportunity to contest the state's use of such evidence.

The record clearly reflects that Mattatall was given that opportunity when he disputed the admissibility of his prior conviction. In fact, all the arguments presented to this court on appeal had been presented to the trial justice during the hearing on the motion in limine. The trial justice, however, observing Mattatall's extensive prior criminal record, permitted the state to use the conviction to impeach Mattatall's credibility.[5] The trial justice properly reasoned that Mattatall's extensive criminal record demonstrated his contempt for the law and that, therefore, Mattatall's burden should be a heavy one in attempting to exclude such evidence. We agree with the trial justice that "[a] jury has the right to weigh whether one who repeatedly refuses to comply with society's rules is more likely to ignore the oath requiring veracity on the witness stand than a law abiding citizen." *Sands*, 76 N.J. at 145, 386 A.2d at 387.

Nothing in the adoption of the Rhode Island Rules of Evidence altered the discretion of the trial justice to rule on the admissibility of prior convictions for impeachment purposes. *State v. Camirand*, 572 A.2d 290, 295 (R.I.1990) (citing *Maxie*, 554 A.2d at 1031). In view of the sound reasoning of the trial justice, we find no abuse of discretion. Consequently the trial justice's actions shall not be disturbed.

## V

Finally Mattatall contends that the trial justice erred in relying upon a prior conviction obtained as a result of an *Alford* plea as a basis for sentencing him as a habitual offender. He argues that the circumstances surrounding his plea to the charge of driving to endanger, death resulting, militated heavily against its use for a habitual-offender determination.

In our view it is not the role of the trial justice at sentencing to determine whether a defendant was improperly convicted at a prior proceeding as a result of the defendant's plea taken pursuant to *North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970).[6] When a defendant enters an *Alford* plea, which is accepted by the court, then such plea in a later judicial proceeding constitutes a conviction, irrespective of the fact that the defendant maintains his innocence and does not stand up and confess guilt. *Crofoot v. United States Government Printing Office*, 761 F.2d 661, 665 (Fed.Cir.1985). Because Mattatall's *Alford* plea was accepted in an earlier proceeding and judgment entered, the trial justice had every right to consider this conviction for purposes of the habitual-offender statute. Consequently the only issue before this court can be whether the circumstances justified Mattatall's enhanced sentence upon retrial.

The United State Supreme Court has clearly stated that "a corollary of the power to retry a defendant is the power, upon the defendant's reconviction, to impose whatever sentence may be legally authorized, whether or not it is greater than the sentence imposed after the first conviction." *North Carolina v. Pearce*, 395 U.S. 711, 720, 89 S.Ct. 2072, 2078, 23 L.Ed.2d 656, 666 (1969). Reversal of the original conviction nullifies the previous sentence, thereby clearing the slate for the imposition of a completely new sentence. *State v. Simpson*, 520 A.2d 1281, 1285 (R.I.1987) (citing *Pearce*, 395 U.S. at 721, 89 S.Ct. at 2078, 23 L.Ed.2d at 667). Therefore, the trial justice on retrial may impose an increased sentence based on "events subsequent to the first trial that may have thrown new light upon the defendant's 'life, health, habits, conduct, and mental

---

5. At the time of trial, Mattatall's criminal record consisted of the following convictions: disorderly conduct (1967); disorderly conduct (1971); assault with a dangerous weapon (1973); driving under the influence of alcohol (1974); leaving the scene of an accident (1978); driving to endanger, death resulting (1979); threatening phone calls (1983); and two convictions for criminal contempt in 1987. The trial justice permitted the state to use the most recent of these convictions starting with the 1973 assault with a dangerous weapon conviction.

6. The *Alford* doctrine provides that a court may accept a knowing and voluntary plea of guilty from a defendant, even though the defendant maintains his innocence, provided that the trial justice determines that there is a factual basis for the plea. *Crofoot v. United States Government Printing Office*, 761 F.2d 661, 663 (Fed.Cir. 1985).

and moral propensities.'" *Simpson,* 520 A.2d at 1285 (quoting *Pearce,* 395 U.S. at 723, 89 S.Ct. at 2079, 23 L.Ed.2d at 667).

In applying these standards, the trial justice cited fourteen separate instances of misconduct between August of 1985 and May of 1987. The trial justice elaborated: "[W]hat clearly surfaces from the various reports of misconduct is an individual who reflects an attitude of hostility and a propensity for violent and volatile behavior, with numerous instances of abusive and threatening conduct." The trial justice also observed Mattatall's conduct at trial: "[T]he Defendant lied under oath at trial. It's clearly implied by the jury's verdict. If it wasn't clearly implied, then you need only look further to the Defendant's spurious motions to take a sodium pentothal test to somehow support a new story that he has as to how the victim was killed." In totality, these circumstances caused the trial justice to conclude:

> "On balance, I'm well satisfied that Mr. Mattatall's habits, conduct, moral and mental propensities, since December of 1984, justify, support, and invite a sentence greater than the sentence he originally received. * * * Society needs to be protected from persons of that like, and particularly those who commit assaults with dangerous weapons and murder. I would be remiss if I did not impose a sentence which, in some measure, is responsive to the protection to which the general public is entitled."

Clearly, the trial justice provided a thorough explanation of his rationale for imposing the enhanced sentence. Based on the careful consideration of objective information provided to the trial justice regarding the events subsequent to Mattatall's first trial, we are convinced that the enhanced sentence was more than justified.

For all these reasons the defendant's appeal is denied and dismissed, the judgment of conviction is hereby affirmed, and the papers of the case are remanded to the Superior Court.